**Karl A. STRONG, Sr., Appellant,**

v.

**Ada P. STRONG, Appellee.**

**No. 05–09–01273–CV.**

Court of Appeals of Texas, Dallas.

Oct. 7, 2011.

Cynthia Woolen Allen, The Allen Law Firm, Dallas, TX, Judith A. Grantham, Carrollton, TX, for Appellant.

Shirley Sutherland, Attorney at Law, Rockwall, TX, Charles W. McGarry, Law Office of Charles W. McGarry, Dallas, TX, for Appellee.

Before Justices MOSELEY, LANG, and MYERS.

## OPINION

Opinion By Justice MYERS.

Karl A. Strong (Father) appeals the divorce and child-custody decree rendered following a trial before the court. Father brings five issues in this appeal asserting the trial court abused its discretion by (1) denying Father's request for a continuance; (2) admitting the report of Mother's drug-test results; (3) refusing to secure the expert testimony of Father's witness and by refusing to admit certain exhibits without the witness having to appear; (4) appointing Mother as the parent with the exclusive right to establish the child's primary residence; and (5) failing to a make a just and right division of the community of property. We affirm the trial court's judgment.

## CONTINUANCE

■ In his first issue, Father contends the trial court abused its discretion by denying Father's oral request for continuance. Texas Rule of Civil Procedure 251 provides that no continuance shall be granted "except for sufficient cause supported by affidavit, or by consent of the parties, or by operation of law." TEX.R. CIV. P. 251. Father's oral motion for continuance was not supported by affidavit, Mother did not consent to a continuance, and Father does not explain why a continuance was required by operation of law. Accordingly, Father has failed to preserve any error from the trial court's denial of his motion for continuance. See *Taherzadeh v. Ghaleh–Assadi*, 108 S.W.3d 927, 928 (Tex.App.-Dallas 2003, pet. denied); *Favaloro v. Comm'n for Lawyer Discipline*, 13 S.W.3d 831, 838 (Tex.App.-Dallas 2000, no pet.).

■ Even if error were preserved, the denial of a motion for continuance will not be disturbed unless the record dis-

closes a clear abuse of discretion. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex.2004). The appellate court does not substitute its judgment for the trial court's but decides only whether the trial court's action was arbitrary and unreasonable. *Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630, 635 (Tex.1986). In determining whether the trial court abused its discretion, the reviewing court considers three nonexclusive factors: (1) the length of time the case been on file, (2) the materiality and purpose of the discovery sought; and (3) whether the party seeking the continuance has exercised due diligence to obtain the discovery sought. *Id.* At the time of the trial, the case had been pending for over two years. The court observed that "there's been a few motions for continuances granted in this case." The discovery Father sought was the extent of Mother's saving and investment accounts. Father states in his brief that although the case had been pending for two years, the parties first exchanged discovery seven weeks before trial with a final exchange of documents in the two days before trial. Under these circumstances of the case having been on file for two years, multiple continuances having previously been granted, and Father not seeking discovery until less than two months before trial, we cannot conclude the trial court clearly abused its discretion in denying the oral motion for continuance on the day of trial.

The record also shows that the trial took place over two days. The second day of trial was more than two weeks after the first day, during which time Mother provided Father with additional information regarding her accounts. Both Mother and Father testified on the second day of trial about the marital finances. Although Father's counsel stated that he lacked adequate time to review the newly provided materials before the second day of the trial, Father does not explain how additional time for discovery would have affected the outcome of the case. We conclude the record does not show that the failure to grant the continuance "probably caused the rendition of an improper judgment." *See* Tex.R.App. P. 44.1(a)(1). Accordingly, any error from the denial of the motion for continuance is not reversible. We overrule Father's first issue.

## ADMISSION OF DRUG–TEST REPORT

■ In his second issue, Father asserts the trial court abused its discretion in admitting Mother's exhibit of the laboratory report of her drug test. The admission and exclusion of evidence is committed to the trial court's discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex.1995); *Costilla v. Crown Equip. Co.*, 148 S.W.3d 736, 738 (Tex.App.-Dallas 2004, no pet.). The trial court abuses its discretion when it acts "without regard for any guiding rules or principles." *Costilla*, 148 S.W.3d at 738–39 (quoting *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998)). We must uphold the trial court's evidentiary ruling if there is any legitimate basis for doing so. *Costilla*, 148 S.W.3d at 739.

Mother testified that she used marijuana during the marriage, and she admitted that she tested positive for marijuana in three court-ordered drug tests in March and April 2007. However, she testified she tested negative for marijuana in five tests in April, May, and June 2007. Mother told the court she had not used marijuana or other illegal drugs in the two years preceding the trial, and she produced the results of a drug test showing she tested negative for drugs from a sample taken six days before the first day of trial.

■ If the trial court's decision to admit the drug-test report was erroneous, we may not reverse the trial court's judgment unless the error probably caused the rendition of an improper judgment. TEX. R.APP. P. 44.1(a)(1). The erroneous admission of evidence is harmless if it is merely cumulative. *Nissan Motor Co., Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004); *In re C.R.*, 263 S.W.3d 368, 370–71 (Tex.App.-Dallas 2008, no pet.). In this case, there was no evidence that Mother had used drugs since her last positive test more than two years before the trial, and the drug-test report is cumulative of Mother's testimony that she had not used marijuana in over two years before the trial. We conclude that any error by the trial court in admitting the drug-test report did not probably cause the rendition of an improper judgment. We overrule Father's second issue.

## SECURING WITNESS'S TESTIMONY

■ In his third issue, Father asserts the trial court abused its discretion by refusing to secure the testimony of Dr. Ezell Autry or by refusing to allow Mother's medical records into evidence without Dr. Autry having to appear. Mother testified that she had an affair during the marriage, but she denied contracting syphilis. Father told the court that although he had subpoenaed Dr. Autry, who would testify he treated Mother for syphilis, Dr. Autry was in surgery and unable to attend the hearing. Father requested that the court admit the medical records without Dr. Autry having to testify. Mother objected because the records had not been on file for fourteen days. *See* TEX.R. EVID. 902(10)(a). The trial court agreed with Mother and stated, "[T]he Court will defer on what to do about this doctor who's not here, who's under subpoena so we'll defer that to the end because apparently we can't do anything about that now. . . . But

I mean certainly the Court could send somebody to go pick him up but given the circumstances I think it would be better just to reset that part." At the end of the trial, the court made arrangements to interview the parties' son and stated that the case would be taken under advisement, but Father did not remind the court about arranging to hear Dr. Autry's testimony or object to the court's taking the case under advisement without hearing Dr. Autry's testimony.

On appeal, Father complains that the trial court did not compel Dr. Autry's appearance. Father did not preserve this issue for appellate review because he did not object to the court's taking the case under advisement without hearing Dr. Autry's testimony. *See* TEX.R.APP. P. 33.1(a).

Father also argues the trial court abused its discretion in denying admission of Father's exhibit of Mother's medical records showing she contracted syphilis when the court admitted Mother's exhibit of the laboratory report of her drug tests. Father does not dispute that this exhibit was hearsay and that no exception to the hearsay rule permitted admission of the exhibit. Father cites no authority in support of his argument. *See* TEX.R.APP. P. 38.1(i). We conclude Father has not shown the trial court abused its discretion in denying admission of the exhibit. We overrule Father's third issue.

## RIGHT TO ESTABLISH CHILD'S PRIMARY RESIDENCE

■ In his fourth issue, Father contends the trial court abused its discretion by appointing Mother joint managing conservator with the exclusive right to establish the child's primary residence. We review a trial court's decision regarding child custody, control, possession, and visitation under an abuse of discretion stan-

dard. *In re K.L.W.,* 301 S.W.3d 423, 424 (Tex.App.-Dallas 2009, no pet.); *Jacobs v. Dobrei,* 991 S.W.2d 462, 463 (Tex.App.-Dallas 1999, no pet.). The trial court is vested with broad discretion to determine which conservator will have the exclusive right to establish the child's primary residence. *In re K.L.W.,* 301 S.W.3d at 428. The trial court's judgment will be disturbed only where the record as a whole shows that the trial court abused its discretion. *Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex.1982); *In re K.L.W.,* 301 S.W.3d at 424. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or when it acts without reference to any guiding principles. *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990) (per curiam); *In re K.L.W.,* 301 S.W.3d at 424–25. The trial court did not file findings of fact and conclusions of law.[1] Therefore, it is implied that the trial court made all the necessary findings to support its final order. *Worford,* 801 S.W.2d at 109; *Burns v. Burns,* 116 S.W.3d 916, 920 (Tex.App.-Dallas 2003, no pet.). The judgment will be upheld on any legal theory that finds support in the evidence. *Weisfield v. Tex. Land. Fin. Co.,* 162 S.W.3d 379, 381 (Tex.App.-Dallas 2005, no pet.).

■ Because the traditional sufficiency standard of review overlaps with the abuse of discretion standard in family law cases, legal and factual sufficiency are not independent grounds of error, but they are relevant factors in our assessment of whether the trial court abused its discretion. *In re K.L.W.,* 301 S.W.3d at 425; *Peck v. Peck,* 172 S.W.3d 26, 33 (Tex.App.-Dallas 2005, pet. denied). To determine whether the trial court abused its discretion because the evidence was insufficient to support its decision, we consider whether the trial court (1) had sufficient evidence upon which to exercise its discretion and (2) erred in its exercise of that discretion. *Vardilos v. Vardilos,* 219 S.W.3d 920, 921 (Tex.App.-Dallas 2007, no pet.). We conduct the applicable sufficiency review with regard to the first question. *K.L.W.,* 301 S.W.3d at 425; *Moroch v. Collins,* 174 S.W.3d 849, 857 (Tex.App.-Dallas 2005, pet. denied). We then proceed to determine whether, based on the evidence, the trial court made a reasonable decision. *Moroch,* 174 S.W.3d at 857. If some evidence of a substantive and probative character exists to support the trial court's decision, there is no abuse of discretion. *In re C.C.J.,* 244 S.W.3d 911, 917 (Tex.App.-Dallas 2008, no pet.).

■ The evidence before the trial court showed the parties married in 1992 and they separated in early 2007. They had one child, K., who was twelve years old at the time of trial. The parties testified that K. signed a statement naming Mother as his preference to have the exclusive right to designate his primary residence. *See* TEX. FAM.CODE ANN. § 153.008

---

1. Thirty days after the trial court signed the final judgment, and 168 days after the hearing, Father filed an untimely request for findings of fact and conclusions of law. *See* TEX FAM.CODE ANN. § 6.711(b) (West 2006) ("A request for findings of fact and conclusions of law under this section must conform to the Texas Rules of Civil Procedure."), § 153.258 (West 2008) (findings of fact and conclusions of law required in all cases in which parent contests possession of child if request made in open court during hearing or within 10 days of hearing), § 154.130 (West Supp. 2010) (findings of fact and conclusions of law required when trial court renders order of child support within the guidelines if requested in open court during hearing or within ten days after the date of hearing); TEX.R. CIV P. 296 (request for findings of fact and conclusions of law "shall be filed within twenty days after judgment is signed"). Appellant does not complain on appeal of the trial court's failure to make findings of fact and conclusions of law.

(repealed 2009);[2] *see also* TEX. FAM.CODE ANN. § 153.134(a)(6) (West 2008) (trial court may consider "the child's preference, if any, regarding the person to have the exclusive right to designate the primary residence of the child").

Mother admitted she used marijuana daily as the marriage failed and before they separated. Father testified that Mother smoked marijuana while driving. Father was afraid for K. to be in a car with Mother, and if K.'s friends were visiting, he would drive them home. Mother testified that she tested positive for marijuana in three court-ordered drug tests in March and April 2007. However, she testified she tested negative for marijuana in five tests in April, May, and June 2007. Mother told the court that she had not used marijuana or other illegal drugs in the two years preceding the trial, and she produced the results of a drug test showing she tested negative for drugs from a sample taken six days before the trial.

Mother admitted she had an affair during the marriage. Father said Mother had multiple affairs and "boyfriends." Father testified they had another child that was still born due to Mother acquiring syphilis. Mother denied that she was ever diagnosed with or treated for syphilis.

The trial court ordered a social study of the family. The social study[3] recommended that K. be placed with Father due to Mother's drug use and concern over Mother's "pattern over the years of having a relapse ever[y] so often." The study recommended that Mother have possession of K. for several hours on Tuesdays, after school on Thursdays until the beginning of school on Fridays, and every other weekend beginning when the child was released from school on Friday until the beginning of school on Monday. The trial court's temporary orders followed the social study's recommendation.[4] The social study permitted Mother to seek to modify the possession schedule to obtain primary custody of K. if she was able to remain drug free for two years.

The social study recommended that Father get a psychological evaluation and an evaluation to assess the interaction and communication skills between him and K., attend counseling "to learn how to deal rationally with his suspicious and rigid thinking," and attend classes for anger management and parenting. Father testified he did not obtain a psychological evaluation or the interaction and communication evaluation. He testified he attended counseling sessions "once or twice" by himself and "once or twice" with K. The record does not show whether he attended the anger-management and parenting classes.

The social study stated that Mother could seek to modify the possession schedule after the 2007–2008 school year if the child continued to perform below his expectations in school and Father did not comply with the recommendations. Be-

2. *See* Act of May 27, 2003, 78th Leg., R.S., ch. 1036, § 5, 2003 Tex. Gen. Laws 2987, 2988, *repealed by* Act of May 29, 2009, 81st Leg., R.S., ch. 1113, § 31, 2009 Tex. Gen. Laws 3056, 3072, *and by* Act of May 29, 2009, 81st Leg., R.S., ch. 1118, § 10, 2009 Tex. Gen. Laws 3078, 3082. Before its repeal effective September 1, 2009, section 153.008 provided, "A child 12 years of age or older may file with the court in writing the name of the person who is the child's preference to have the exclusive right to designate the primary residence of the child, subject to the approval of the court."

3. The social study is not in the record, but the parties and the social worker who performed the study testified as to its contents.

4. The temporary orders are also not in the record, but the parties testified about their provisions.

fore the separation, K. was either a straight-A student or he made all As and Bs. After the separation, however, his grades fell into the 70s and 80s.

When K. stayed with Father, his day began at 3:00 a.m. because Father had to be at work at 4:30 a.m. Father would take K. to a friend's house, where K. could sleep some more, and then he would go to daycare before going to school. K. would then go to the school nurse to receive his ADHD medicine immediately before his first class. K.'s medicine needed at least an hour to take effect. K.'s first class was math, and the teacher testified that K. was sometimes inattentive in that class. K.'s worst grade was in math, and Father arranged and paid for tutoring in math for him. After school, when K. was staying with Father, K. would walk to Father's house, and Father testified that he would work with him on his homework before letting K. go outside to play.

Father testified that he stayed in contact with K.'s teachers through email. Two of K.'s teachers testified about Father's communications with them. They also testified that K. is now doing better in school.

When K. stayed with Mother, she would drive him to school before getting to work at 7:30 or 7:45 a.m. After school, K. would ride the bus to a friend's house, and Mother would leave work at 4:00 p.m. to pick him up. Although Father lived only three blocks from K.'s school and was at home when K.'s school ended, Father refused to let K. stay at his house after school on days that Mother was to pick him up.[5] Mother testified that she would work with K. on his homework as well as take him to the library to check out books because reading was another subject with which K.

was struggling. She also testified about their social activities together, including playing video games, going to the mall, visiting friends and family, and going to church. Father testified that he thought it was important for K. to attend church, but he never took him to church. Mother paid the fees for K. to participate in football and basketball. She testified that Father attended K.'s football games the first year of their separation, but in the second year, he attended the football games only when he had possession of K. Father never attended any of the basketball games.

Mother testified that Father did not interact with K. enough and did not spend enough time talking with K. She testified that when K. was staying with Father, K. would call her and talk to her, and she thought K. was lonely when staying with Father.

Mother also testified she was concerned about Father's anger-control problems. According, to her, when things did not go Father's way, he would go into a rage, screaming and hitting things. Father never hit her, but he did punch holes in the walls. Sometimes, when K. would call her from Father's house, she could hear Father screaming in the background. On one occasion, Father grabbed K. and gouged out some flesh on his arm, which left a scar. On another occasion, when K. refused to give Father a cellular telephone, Father wrestled with K. to take the telephone from him, breaking the telephone in the process. Father testified that his usual disciplinary techniques were prohibiting K. from watching television, sending K. to his room, or requiring K. to wash dishes.

Mother also testified to concerns about Father's care of K. On one occasion, K.

5. Father explained that after Mother insisted on keeping K. for Christmas, as the court's order permitted, he insisted that she follow all parts of the order, including that she pick him up from school on Tuesdays and Thursdays.

complained to her about his foot hurting, and she told him to tell Father. When she picked him up a few days later, K.'s foot still hurt and he had not been to a doctor. Mother took K. to a doctor, and she testified that the doctor determined that K.'s foot or toe was broken. Father testified that K. had a sprained toe and that he did not take him to the doctor because he "didn't find the sprain until later and by then [K.] had stopped complaining about it."

Mother also testified that she has trouble communicating with Father about K. When she calls Father to talk about K., he hangs up on her. Father testified that Mother does not call him to talk about K. and that "she argues too much and sarcastically." Mother testified that when Father needs to communicate with Mother, he does not tell her directly; instead, he instructs K. to tell her something. Mother testified that K. looks "very uncomfortable" when relaying a message from Father.

Father argues that overwhelming evidence supported his being named the parent with the right to establish the child's primary residence, including evidence of Mother's drug use, the fact that the child was in his primary care for the two years preceding trial, the recommendation of the court-appointed social worker, and the testimony of two of the child's teachers. However, the evidence supported the trial court finding that Mother had successfully battled her drug problem. Although the social worker recommended that K. be placed with Father, the trial court could conclude that recommendation was largely based on Mother's past drug use, and by the time of trial, Mother had been drug free for two years. The social worker was concerned about Father's interaction with K. and with Father's anger management. The trial court could conclude that Father

had not done anything to improve in these areas. Although the teachers testified about Father's communications with them and the child's improvement in school, the court could conclude the improvement was due equally to Mother's and Father's helping K. with his schoolwork. The trial court also had before it evidence of physical violence by Father on K. The record shows K. filed a statement of his preference that Mother have the exclusive right to designate his residence. The record also shows the trial court interviewed K. See TEX. FAM.CODE ANN. § 153.009(a) (West 2008) (trial court shall interview child aged 12 or older in chambers "to determine the child's wishes as to the person who shall have the exclusive right to determine the child's primary residence"). As there is no reporter's record of the interview and no findings of fact or conclusions of law, we must presume K.'s statements in the interview support the trial court's judgment that Mother have the exclusive right to designate K.'s residence. See Treviño & Gonzalez Co. v. R.F. Muller Co., 949 S.W.2d 39, 40 (Tex.App.-San Antonio 1997, no writ).

After reviewing the entire record, we conclude the trial court had sufficient evidence to exercise its discretion to appoint Mother as the conservator with the exclusive right to designate the child's residence, and the trial court's decision was reasonable. See Moroch, 174 S.W.3d at 857. Accordingly, the evidence does not show the trial court abused its discretion in designating Mother as the conservator with the exclusive right to designate the child's residence.

Father also asserts that the trial court's post-trial but prejudgment memorandum ruling, which stated that Mother would have "all the rights of a sole managing conservator," stripped Father of the following rights:

(a) the right to consent to medical, dental, and surgical treatment involving invasive procedures;

(b) the right to consent to psychiatric and psychological treatment;

(c) the right to represent the child in legal action and to make other decisions of substantial legal significance concerning the child;

(d) the right to consent to marriage and to enlistment in the armed forces of the United States;

(e) the right to make decisions concerning the child's education; and

(f) except when a guardian of the child's estate or a guardian or attorney ad litem has been appointed for the child, the right to act as an agent of the child in relation to the child's estate if the child's action is required by a state, the United States, or a foreign government.

*See* TEX. FAM.CODE ANN. § 153.132(2), (3), (5), (6), (7), (9) (West 2008).

The trial court's final judgment, however, did not follow the memorandum ruling in that regard. In the "Final Decree of Divorce" the trial court gave Father and Mother the same rights and duties except that Mother had "the exclusive right to designate the primary residence of the child in Dallas and contiguous counties" and "the exclusive right to receive and give receipt for periodic payments for the support of the child and to hold or disburse these funds for the benefit of the child." The final judgment specifically provided Father with the rights under section 153.132 of the family code that he maintains the court denied him. Because the final judgment decrees that Father has those rights, this argument lacks merit.

We overrule Father's fourth issue.

## DIVISION OF THE PARTIES' ESTATE

In his fifth issue, Father contends the trial court abused its discretion in the division of the community estate because the trial court did not make a just and right division of the community property. *See* TEX. FAM.CODE ANN. § 7.001 (West 2006) ("In a decree of divorce or annulment, the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage."). Under this issue, Father presents three arguments: (1) the trial court lacked adequate information to determine the value of Mother's retirement savings, (2) Mother committed a fraud on the community estate, and (3) the trial court erred in denying Father's motion for new trial showing that Mother had secretly borrowed against the home's equity.

### Mother's Retirement Savings

 Father argues that Mother presented insufficient evidence of the value of her retirement savings for the trial court to determine that his award of all of those funds to Mother made the overall division of the community property "just and right." In his brief, Father quotes extensively from the first day of the hearing when Mother was unsure of the amounts in her accounts and did not have copies of the statements. At the second day of the hearing, however, Mother had more precise information and copies of some of her account statements.

The evidence showed that Mother had jobs with several employers during the marriage and that she had retirement savings accounts with those companies. After her employment with AT & T ended, Mother moved those retirement savings into an account with Ameriprise.

When her jobs with other employers ended, she moved her retirement savings into an account with MetLife. When MetLife no longer handled those accounts, she moved those funds into an account with Fidelity Investments. Additionally, Mother had retirement savings with her current employer, Argo. Some of her previous employers had employee stock-option programs, but she stated that she never exercised the options to purchase the stock.

■■■ Mother testified that the Ameriprise account was worth "about $31,000 or $33,000." In the trial court's post-trial memorandum, the court stated the value of the account was $32,000.[6] She testified her retirement savings with Fidelity Investments were "like $4243." Mother's account statement from Fidelity showed her account balance as of March 31, 2009, which was twenty-nine days before the first day of trial, was $44,773.15. The trial court stated in its post-trial memorandum that the Fidelity account's value was $42,500. Mother testified her retirement savings with her current employer, Argo, were worth "[p]robably about $7,000 or $8,000"; in the post-trial memorandum, the trial court stated her retirement savings with Argo were $6,500. Thus, the evidence before the trial court showed the value of Mother's retirement savings was between $80,000 and $85,773.15. This evidence provided sufficient information for the trial court to make a just and right division.

## Baton Rouge Property

■■■ Father asserts that Mother's transfer of a house in Baton Rouge, Louisiana to her sister for significantly less than the house's market value without his knowledge or approval constituted a fraud on the community.

The evidence before the trial court showed that in 2005, Mother's parents wished to sell their house and Mother's sister wished to purchase it. The sister could not purchase the parents' house until she first sold her house, but she was having difficulty selling it. Mother, her sister, and her parents agreed that Mother and Father would purchase the parents' house for $40,000, and when the sister sold her house, Mother and Father would sell the house to her for $40,000. On March 14, 2005, Mother and Father purchased the Baton Rouge house from the parents by borrowing $32,000 on a home-equity loan from WellsFargo Bank, added another $3000 of their own funds to make $35,000, and gave that money to the parents. Mother and Father promised to pay the parents the remaining $5000. The sister sold her house about three months later for $32,000 and gave that money to Mother together with a promise to pay the remaining $5000.[7] Mother paid $5000 to her parents and paid the remaining $27,000 to WellsFargo to pay down the home-equity loan. On May 28, 2005, Mother executed a deed of gift to the sister for the Baton Rouge house, and Mother signed Father's name on the deed. Mother testified that Father was aware of these proceedings,

6. Father states in his brief that this testimony is "suspicious" because "there are no documents proving up this value." The trial court, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *In re P.C.S.*, 320 S.W.3d 525, 543 (Tex.App.-Dallas 2010, pet. denied).

7. The amount the sister sold her house for and the amount that remained owing to Mother and Father is not entirely clear. There is no documentation. Mother testified that the sister sold her house for both $32,000 and $35,000.

agreed to her transferring the house to the sister, and told her "to take care of it."

Father testified that Mother told him they were buying the Baton Rouge house to have a place to stay when they visited Louisiana. He stated he did not know they were buying the house to resell to Mother's sister. He testified that he did not sign the deed transferring the house, he did not agree to the transfer of the house, and he did not know the house had been transferred until the divorce proceedings began.

■■■ Fraud on the community can be committed through actual or constructive fraud. A spouse commits actual fraud against the other spouse's interest in the community when the spouse transfers community property or expends community funds for the primary purpose of depriving the other spouse of the use and enjoyment of the assets involved in the transaction. *Wright v. Wright*, 280 S.W.3d 901, 908–09 (Tex.App.-Eastland 2009, no pet.). Constructive fraud does not require a showing of fraudulent intent and may be shown if one spouse unfairly deprives the other spouse of the benefit of community property. *In re Marriage of Notash*, 118 S.W.3d 868, 873 (Tex.App.-Texarkana 2003, no pet.). A presumption of constructive fraud arises where one spouse disposes of the other spouse's interest in community property without the other spouse's knowledge or consent. *Jackson v. Smith*, 703 S.W.2d 791, 795 (Tex.App.-Dallas 1985, no writ).

Whether there was fraud on the community depends on whether Mother transferred the Baton Rouge house without Father's knowledge or consent. The evidence on that issue is conflicting: Mother testified Father knew about the transfer to the sister, agreed to it, and told her "to take care of it." Father testified he did not agree to the transfer to the sister and

that he was unaware that it occurred until the divorce proceedings. The trial court, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *In re P.C.S.*, 320 S.W.3d 525, 543 (Tex.App.-Dallas 2010, pet. denied). Here, the record contains evidence that Mother did not commit actual or constructive fraud against Father's community property interest in the Baton Rouge house. Father's argument that Mother committed fraud on the community estate lacks merit.

### Motion for New Trial

■■ Father also contends the trial court abused its discretion in not granting his motion for new trial based on newly discovered evidence that Mother had borrowed $14,200 on the WellsFargo Bank home-equity line of credit, which he did not discover until after the court signed the final judgment. The trial court awarded Father the house and "[a]ll encumbrances, ... liens[,] assessments, or other charges due on the real and personal property awarded to" Father in the judgment, which included the lien for the home-equity account. Father asserts this lien on the house for $14,200 made the court's distribution of the parties' estate not "just and right." The motion for new trial was overruled by operation of law.

■■■ A party seeking a new trial on the ground of newly discovered evidence must show the trial court that: (1) the evidence has come to his knowledge since the trial; (2) it was not owing to the want of due diligence that it did not come sooner; (3) it is not cumulative; and (4) it is so material that it would probably produce a different result if a new trial were granted. *Jackson v. Van Winkle*, 660 S.W.2d 807, 809 (Tex.1983), *overruled on other grounds by Moritz v. Preiss*, 121 S.W.3d 715 (Tex. 2003); *Mitchell v. Bank of Am., N.A.*, 156

S.W.3d 622, 629 (Tex.App.-Dallas 2004, pet. denied). We review a trial court's denial of a motion for new trial under an abuse of discretion standard. *Hinkle v. Hinkle,* 223 S.W.3d 773, 783 (Tex.App.-Dallas 2007, no pet.).

A movant's mere allegations will not suffice to obtain a new trial on the basis of newly discovered evidence; rather, admissible evidence must be introduced at a hearing on the motion for new trial establishing such essential facts as no prior knowledge on the part of the movant, the prior diligence exercised by the movant, and the nature of the newly discovered evidence. *Bell v. Showa Denko K.K.,* 899 S.W.2d 749, 757 (Tex.App.-Amarillo 1995, writ denied).

The parties did not put on any evidence at the hearing on the motion for new trial. Mother argued that Father had not shown due diligence in discovering evidence of the outstanding balance on the home-equity line of credit based on Mother's testimony at trial. Father argued the trial record showed Mother was deceitful about the home-equity loan. The trial court directed Father to file by November 6, 2009, a list of record references that he believed would show Mother was deceitful regarding the home-equity loan. Father never filed the record references as requested by the trial court. Instead, on November 17, 2009, two days after the motion for new trial was overruled by operation of law, Father filed an unauthenticated photocopy of the November 2009 bank statement for the WellsFargo home-equity line of credit showing a balance of $14,099.11 and a certified copy of the deed of trust for the account. *See* Tex.R. Civ. P. 329b(c) (motion for new trial overruled by operation of law seventy-five days after judgment was signed).

The record does not show Father presented any evidence that the failure to discover the evidence until after the trial was not owing to a want of due diligence. The trial court gave Father extra time to make a showing to meet this element before the motion for new trial was overruled. However, Father did not present any evidence to meet the required elements for a motion for new trial based on newly discovered evidence before the motion was overruled by operation of law.

We conclude that Father has not shown the trial court abused its discretion by not granting the motion for new trial. We overrule Father's fifth issue.

We affirm the trial court's judgment.