# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00758-CV

---

**Robert Douglas Rue, Appellant**

**v.**

**Alicia McCullough Rue, Appellee**

---

### FROM THE 126TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-16-007132, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Robert Douglas Rue appeals from a judgment dissolving his marriage to Alicia McCullough Rue.[1] Robert argues that the district court abused its discretion in dividing the community estate and by ordering Robert to pay $3,000 per month in spousal maintenance for ten years. We affirm.

## BACKGROUND[2]

The parties married in 1990. Robert worked in the insurance industry at the beginning of the marriage but transitioned full time into building homes in 2003 or 2004. Alicia taught school from 1990 to May 1994, when she became pregnant with the first of their four children. Alicia was a stay-at-home mother for the next twenty-seven years.

---

[1] We refer to the parties by their first names because they share a surname.

[2] We draw these facts from the testimony of Robert and Alicia and the documentary evidence admitted at trial.

Alicia testified that Robert "always handled the finances" during the marriage and that this was a source of conflict. She "did not feel comfortable not knowing about the finances" but, "for some reason, either [Robert] couldn't, didn't want to, [or] didn't know how" to include her. Approximately once a month, Alicia would ask him: "How are we doing? Like what's going on? What work do you have?" In response, Robert "would hand [her] a piece of paper to tell me what projects he had or where he was at." Alicia acknowledged on cross-examination that she could have accessed their joint accounts but did not because Robert frequently assured her that "we're fine."

That changed in 2016 when Alicia wanted to check the bank account of one of her daughters. She discovered the account was empty and learned that Robert had drained $8,000 from the account of one daughter and $6,000–$7,000 from the account of another. This prompted Alicia to investigate their finances, and she discovered that they "were in financial trouble, big trouble." Alicia estimated that it took "about a year, year and a half to really figure out everything" because Robert would tell her only "what he needed to tell [her] or what [she] found out, and then there would be more later." She discovered that Robert had, without her knowledge, opened a line of credit at Wells Fargo and taken out at least $35,000; incurred between $80,000–$100,000 in debt on credit cards that she did not know existed; taken out a second mortgage on their main residence, the University Club property; and drained $100,000 from a savings account, $150,000 from an IRA at LPL Financial, and $100,000 from an Edward D. Jones brokerage account. Alicia also discovered that the parties owed $200,000 to the IRS because Robert had not filed their taxes since 2011. Alicia testified that she signed their tax return every year and gave it to Robert, who always assured her later that he filed it. Alicia

2

testified that Robert explained to her that he had "got behind" with their finances and "thought that he was going to get out of it before [she] needed to know."

Alicia filed a petition for divorce in 2016 but did not pursue it because the parties attempted to reconcile. She explained at trial that she felt Robert had "gotten caught up" with maintaining the same lifestyle as their neighbors and friends and appreciated that he was taking steps to get the family out of their financial difficulties. The parties placed their residence on University Club Drive and a Kerrville rental house (Wigwam Property) on the market while they moved into a rental house in Austin with their youngest daughter, E.G.R.[3] Both properties sold after a year, and the parties used the equity to settle the tax debt and pay off the second mortgage. With $75,000 remaining from the sale of the University Club property, the parties purchased the Canyon Glen home. In 2018, Robert moved to Kerrville to be closer to several houses he was developing.

Alicia started looking for jobs when the parties moved out of the University Club home. The parties mutually agreed that she should find a job that would enable her to be at home when E.G.R. returned from school. Alicia took a part-time job delivering cookies for Tiff's Treats and, in 2018, began working part-time at the front desk of a doctor's office. The doctor agreed that Alicia would work from 8:00 a.m. to 3:00 p.m. until E.G.R. received her driver's license and then transition to working full time. When that time came, Alicia decided to take a job nannying two to three days a week instead because it paid better and was closer to her house.

---

[3] We follow the parties in referring to E.G.R. by her initials even though she is now an adult.

3

E.G.R. sustained a serious concussion in the summer of 2019. Alicia testified that E.G.R. could not "walk down the stairs to make food," watch television, or use her phone or laptop. When school started in the fall, Alicia would read E.G.R.'s assignments to her and write down her responses. Alicia took a different nannying job with a family who allowed E.G.R. to sleep in their house while Alicia was working. In January and February of 2020, E.G.R attended school in person for a few hours a day. She briefly returned to full-time attendance before schools stopped in-person instruction because of COVID-19.

On Father's Day 2020, Robert informed Alicia that he had been in a relationship with someone for six months. Alicia looked at their finances and discovered that Robert paid for restaurants, concerts, traveling, and substantial purchases at H-E-B with his paramour from the parties' joint account. Alicia opened a checking account and began depositing all her earnings there.

E.G.R improved enough to do her schoolwork without assistance and graduated from high school in 2021. After she left for college, Alicia continued nannying and began training to work for a chiropractor. The chiropractor told her a few months later that he could not find office space for her, and she decided to take additional nannying jobs. She had considered applying for a teaching position but thought she could make more money nannying. Alicia wanted to continue nannying and "maybe even turn it into a business of some sort" but ultimately decided to apply to teaching positions at two school districts. She had not received a decision on either application by the time of trial.

The district court admitted two budgets Alicia had prepared. The first showed a total of $7,199.16 in monthly expenses. The second showed her monthly expenses at $5,050 but omitted items such as groceries and expected medical care. In the same budget, she calculated

that her net monthly salary from a teaching job (should she be offered one) would be between $2,600–$3,000.

In February of 2022, Alicia filed an amended petition asking the district court to find that Robert committed fraud on the community, award her a disproportionate share of the community estate, and order him to pay spousal maintenance. The parties tried the case to the bench on April 11–12, 2022. The district court subsequently signed a final decree of divorce, awarding 55% of the community estate to Alicia and 45% to Robert and awarding Alicia a $545,222.45 judgment—payable in monthly installments of $4,543.52—for Robert's fraud on the community. The district court further ordered Robert to pay Alicia $3,000 in spousal maintenance per month for ten years. At Robert's request, the district court issued findings of fact and conclusions of law. Robert's motion for new trial was overruled by operation of law, and this appeal followed.

## DISCUSSION

Robert argues in two issues that the district court abused its discretion by finding that he committed fraud on the community and awarding Alicia a disproportionate share of the community estate and by ordering him to pay spousal maintenance.

**Standard of Review**

We review a trial court's division of community property and award of spousal maintenance for an abuse of discretion. *See Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981) (property division); *Kelly v. Kelly*, 634 S.W.3d 335, 364 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (spousal maintenance). It is an abuse of discretion for a trial court to rule arbitrarily,

5

unreasonably, without regard for guiding rules or principles, or without supporting evidence. *Transcor Astra Group S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 482 (Tex. 2022).

Under an abuse-of-discretion standard, the "legal and factual sufficiency of the evidence are not independent grounds of error but instead are factors used to determine whether the trial court abused its discretion." *A.S. v. Texas Dep't of Fam. & Protective Servs.*, 665 S.W.3d 786, 795 (Tex. App.—Austin 2023, no pet.) (citing *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied)). The reviewing court considers first whether the trial court had sufficient information on which to exercise its discretion and, if so, whether the trial court erred in its application of discretion. *Id.* (citing *Zeifman*, 212 S.W.3d at 588). "The traditional sufficiency review comes into play with regard to the first question." *T.E. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00067-CV, 2022 WL 3092885, at \*8 (Tex. App.—Austin Aug. 4, 2022, no pet.) (mem. op.) (citing *Zeifman*, 212 S.W.3d at 588). The court then determines whether, based on that evidence, the trial court's decision was reasonable. *A.S.*, 665 S.W.3d at 795.

In reviewing for legal sufficiency, "we view the evidence in the light most favorable to the verdict, crediting favorable evidence when reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not." *Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 794 (Tex. 2020). A party challenging the legal sufficiency of an adverse finding on which it did not bear the burden of proof at trial "must demonstrate on appeal that no evidence supports the adverse finding." *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). We will sustain a no-evidence challenge when (1) evidence of a vital fact is absent, (2) rules of law or evidence bar us from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere

scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Bos v. Smith*, 556 S.W.3d 293, 299–300 (Tex. 2018).

In reviewing for factual sufficiency, "we examine the entire record and consider and weigh all the evidence, both in support of and contrary to the challenged finding." *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). When a party attacks the factual sufficiency of an adverse finding on which it did not bear the burden of proof, we will set aside the finding "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Republic Petroleum LLC v. Dynamic Offshore Res. NS LLC*, 474 S.W.3d 424, 433 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)).

Under either standard, the trier of fact "is the sole judge of the credibility of witnesses and the weight to be given their testimony." *Altice v. Hernandez*, 668 S.W.3d 399, 410 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)). We therefore "may not pass upon the witnesses' credibility or substitute our judgment for that of the fact finder." *4922 Holdings, LLC v. Rivera*, 625 S.W.3d 316, 325 (Tex. App.—Houston [14th Dist.] 2021, pet. denied).

**Reconstituting the Community Estate**

Robert argues in his second issue that the district court erred by concluding that he depleted the community estate through constructive fraud and awarding Alicia a disproportionate share of the reconstituted estate.

In a divorce case, the trial court must order a division of the community estate in a manner the court deems "just and right, having due regard for the rights of each party and any

children of the marriage." Tex. Fam. Code § 7.001. Trial courts have "wide latitude" in determining what constitutes a just and right division, *Murff*, 615 S.W.2d at 698, and may order an unequal division of property if there is a reasonable basis for doing so, *O'Carolan v. Hopper*, 414 S.W.3d 288, 311 (Tex. App.—Austin 2013, no pet.).

Waste of community assets by a spouse may support an unequal division of property. *Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex. 1998). "A fiduciary duty exists between a husband and a wife as to the community property controlled by each spouse." *Puntarelli v. Peterson*, 405 S.W.3d 131, 137 (Tex. App.—Houston [1st Dist.] 2013, no pet.). A presumption of "'constructive fraud' arises when one spouse disposes of the other spouse's interest in community property without the other's knowledge or consent." *Id.* at 137–38. Once the presumption arises, the burden of proof "shifts to the disposing spouse to prove the fairness of the disposition of the other spouse's one-half community ownership." *Id.* at 138. If the trier of fact finds that a spouse committed fraud, the trial court shall "calculate the value by which the community estate was depleted as a result of the fraud on the community and calculate the amount of the reconstituted estate" and "divide the value of the reconstituted estate between the parties in a manner the court deems just and right." Tex. Fam. Code § 7.009(b).

In its findings and conclusions, the district court concluded that Robert improperly dissipated $628,000 in community property. In an attached spreadsheet, the district court listed seven specific dispositions included in that amount:

> (1) $100,000 of equity from the sale of the University Club residence used to settle the tax debt;
>
> (2) $95,000 from the sale of the Wigwam Property;
>
> (3) $257,000 depleted from the brokerage and retirement accounts;

8

(4) $6,000 from the children's savings accounts;

(5) $100,000 from the second mortgage on the University Club residence;

(6) $45,000 in credit card debt that was cleared with community funds; and

(7) $20,000 of the line of credit that was cleared with community funds.

Robert argues that there is legally and factually insufficient evidence that these dispositions were constructively fraudulent.

First, Robert argues that there is no presumption of fraud regarding the $100,000 from the sale of the University Club residence to settle the tax debt because Alicia testified that she was aware of the tax debt and the sale of the property. While Alicia testified that she reviewed and signed the tax returns each year, she also testified that she believed Robert when he told her each year that he had paid the taxes. Robert does not challenge Alicia's testimony that she was unaware of his failure to pay the taxes. The presumption of fraud arose regarding this sum. *Cf. Massey v. Massey*, 807 S.W.2d 391, 402–03 (Tex. App.—Houston [1st Dist.] 1991), *writ denied*, 867 S.W.12d 766 (Tex. 1993) (upholding jury finding that husband committed waste by incurring debt without wife's knowledge or consent).

Next, Robert argues that here is no evidence of constructive fraud regarding the $95,000 from the sale of the Wigwam Property because it is "undisputed that the parties agreed to sell the rental property in Kerrville to pay for bills and living expenses." The sale of the property, however, is not the allegedly fraudulent disposition. Alicia testified that she proposed selling the property—intended as an asset for their retirement—to pay off the debt to the IRS and the second mortgage.[4] Robert does not dispute that Alicia was unaware of his failure to pay the

---

[4] To the extent Robert contends that the $95,000 was used to settle different debts, the district court implicitly determined that Alicia's testimony was more credible, and we must defer

9

taxes, and we conclude below that even if Alicia was aware of the second mortgage, she did not consent to it.  The presumption of fraud thus arose as to both debts.  *See Puntarelli*, 405 S.W.3d at 138 (explaining that no "intent to deceive" required for proof of constructive fraud).  The district court did not err by including the $95,000 used to settle these debts in the reconstituted estate.

Next, Robert argues that the district court abused its discretion by including the $257,000 from the retirement and brokerage accounts, the line of credit cleared with $20,000 in community funds, and $45,000 in credit card debt that was settled with community funds because there is no evidence "that either spouse dishonestly or purposefully with the intent to deceive, deprived the community estate of assets to the detriment of the other spouse."  These arguments reference an alternative form of committing waste, actual fraud.  *See Strong v. Strong*, 350 S.W.3d 759, 771 (Tex. App.—Dallas 2011, pet. denied) ("Fraud on the community can be committed through actual or constructive fraud.").  Establishing actual fraud requires showing that a spouse transferred community property or expended community funds "for the primary purpose of depriving the other spouse of the use and enjoyment of the assets involved in the transaction."  *Id.* (citing *Wright v. Wright*, 280 S.W.3d 901, 908 (Tex. App.—Eastland 2009, no pet.)).  Proving actual fraud requires evidence of the spouse's "subjective intent," but "[n]o 'dishonesty of purpose of intent to deceive' must be established" for constructive fraud. *Puntarelli*, 405 S.W.3d at 138 (quoting *Everitt v. Everitt*, No. 01-11-00031-CV, 2012 WL 3776343, at *5 (Tex. App.—Houston [1st Dist.] Aug. 31, 2012, no pet.) (mem. op.)).

---

to that determination.  *See Altice v. Hernandez*, 668 S.W.3d 399, 410 (Tex. App.—Houston [1st Dist.] 2022, no pet.); *4922 Holdings, LLC v. Rivera*, 625 S.W.3d 316, 325 (Tex. App.—Houston [14th Dist.] 2021, pet. denied).

Alicia alleged both actual and constructive fraud, but the district court concluded that Robert had engaged in constructive fraud.[5] Alicia testified that she was unaware of the line of credit or the credit cards he used to incur $45,000 in debt, and she did not know that he had liquidated the retirement and brokerage accounts. The district court did not abuse its discretion by concluding these dispositions were constructively fraudulent and including them in the reconstituted estate.

Robert's sole argument regarding the children's savings accounts is that he eventually replaced part of the funds that he removed. He does not dispute that Alicia was unaware he drained the accounts, and he does not argue that she consented. The district court did not err in including these funds in the reconstituted estate.

Next, Robert argues that no presumption of fraud arose regarding the second mortgage because Alicia signed off on it. That the mortgage document bears her signature does not necessarily prevent the presumption of fraud from arising if she did not consent to it. *See Everitt*, 2012 WL 3776343, at *3 ("The presumption may arise even when the other spouse has knowledge of the disposition, so long as she did not also consent to the disposition."). Alicia denied that she knew of the mortgage and explained in her testimony that she routinely signed documents Robert gave her without inquiring into the details because she trusted him. Moreover, Alicia testified that she would not have signed off on any second mortgage if she knew their true financial situation, particularly the debt to the IRS. Based on this evidence, the district court did not abuse its discretion in implicitly concluding the presumption of constructive fraud arose because she did not consent to taking out the second mortgage.

---

[5] The district court found that Robert "improperly dissipated" or wasted assets from the community estate without Alicia's knowledge or consent but makes no mention of the subjective intent requirement of actual fraud.

11

Applying the appropriate standards of review, we conclude that there is legally and factually sufficient evidence to support a finding of constructive fraud regarding these seven sums.  We overrule Robert's second issue.

**Spousal Maintenance**

Next, Robert argues that the district court abused its discretion by ordering him to pay Alicia spousal maintenance of $3,000 per month for ten years.

The Family Code authorizes trial courts to "award spousal maintenance 'only under 'very narrow' and 'very limited circumstances.'" *Marin v. Marin*, No. 03-22-00013-CV, 2023 WL 2776296, at *2 (Tex. App.—Austin Apr. 5, 2023, no pet.) (mem. op.) (quoting *Dalton v. Dalton*, 551 S.W.3d 126, 130 (Tex. 2018)).  Alicia sought maintenance under Section 8.051(2)(B), which provides in relevant part that:

> In a suit for dissolution of a marriage . . . the court may order maintenance for either spouse only if the spouse seeking maintenance will lack sufficient property, including the spouse's separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs and:
>
> . . .
>
> (2) the spouse seeking maintenance:
>
> …
>
> > (B) has been married to the other spouse for 10 years or longer and lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs . . . .

Tex. Fam. Code § 8.051(2)(B).

There is a "rebuttable presumption" that maintenance under this subsection "is not warranted" unless the spouse seeking maintenance has exercised diligence in either "earning

sufficient income to provide for the spouse's minimum reasonable needs" or "developing the necessary skills to provide for the spouse's minimum reasonable needs during a period of separation and during the time the suit for dissolution of the marriage is pending." *Id.* § 8.053(a). Additionally, a maintenance order may not exceed ten years in duration, *id.* § 8.054(a)(1)(C), and the trial court must further limit its duration "to the shortest reasonable period that allows the spouse seeking maintenance to earn sufficient income to provide for the spouse's minimum reasonable needs," *id.* § 8.054(a)(2).

Robert argues that the district court abused its discretion because there is legally and factually insufficient evidence that Alicia (1) will lack sufficient property to meet her minimum reasonable needs after the divorce, (2) has been diligent in seeking employment, (3) requires $3,000 per month to meet her needs, and (4) that ten years is the minimum reasonable time for her to earn sufficient income.

### Sufficient Property

Robert first argues that there is insufficient evidence that Alicia will lack "sufficient property" to meet her minimum reasonable needs after the divorce. *See id.* § 8.053(a). The district court awarded Alicia the following assets: the $545,222.45 equalization judgment; $13,311 in a checking account; her teacher retirement account valued at $20,497.63; her vehicle; and the Canyon Glen home, which is valued at $715,000. Alicia testified that she intends to sell the home, which Robert estimated will yield a net profit of $361,718.73. Robert asserts that these assets are "more than sufficient" to provide for her minimum reasonable needs of $7,199.16 per month.

13

The Family Code does not define the term "minimum reasonable needs," *Everitt*, 2012 WL 3776343, at *8, and determining what the "minimum reasonable needs" are for a particular individual "is a fact-specific determination which must be made by the trial court on a case-by-case basis," *Diaz v. Diaz*, 350 S.W.3d 251, 254 (Tex. App.—San Antonio 2011, pet. denied). When considering whether the spouse seeking maintenance will have sufficient property after the divorce, "the trial court may consider the liquidity of the assets awarded to her and their ability to produce income," *Everitt*, 2012 WL 3776343, at *8, but "the law does not require a spouse to spend down long-term assets, liquidate all available assets, or incur new debt simply to obtain job skills and meet needs in the short term," *Sherman v. Sherman*, 650 S.W.3d 897, 901 (Tex. App.—Fort Worth 2022, no pet.); *see also Martinez v. Martinez*, No. 02-21-00353-CV, 2022 WL 17986023, at *5 (Tex. App.—Fort Worth Dec. 29, 2022, no pet.) (mem. op.) ("[T]he mere fact that Wife received significant property in the divorce is not sufficient to show that the trial court abused its discretion by awarding Wife spousal maintenance."). Alicia estimated that her net income from a teaching job would be $2,600 a month. As Robert admits in his fourth argument, that salary plus the monthly installment payment of $4,543.52 is less than her estimated minimum reasonable needs of $7,199.16 per month. Alicia is not required to liquidate the assets she was awarded to make up the shortfall. *See Sherman*, 650 S.W.3d at 901. The district court did not abuse its discretion by concluding that Alicia will lack sufficient property to meet her minimum reasonable needs after the divorce. *See* Tex. Fam. Code § 8.053(a).

14

*Diligence*

Robert argues that the record shows Alicia did not exercise diligence in earning sufficient income. *See id.* § 8.053(a)(1). Specifically, he argues that Alicia never applied for a teaching job until the week before trial even though she has an active teaching certificate. Instead, she worked part time as a nanny. The inquiry is not limited to whether she applied for the most lucrative job available but whether she earned "sufficient income" to provide for her minimum reasonable needs. *See id.*; *Day v. Day*, 452 S.W.3d 430, 435 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (rejecting argument that spouse claiming maintenance "must show that she has sought additional or more lucrative employment"). Alicia testified that when she began looking for work, the parties agreed she should be at home when E.G.R. (a freshman in high school at the time) returned from school because she was troubled by her parents' marital problems. Alicia took the job at Tiff's Treats and negotiated the temporary part-time hours at the doctor's office for that purpose. Alicia did not start working a full schedule at the doctor's office because nannying paid better and was closer to her home. Later, when E.G.R. sustained the concussion, the part-time schedule allowed Alicia to care for her while Robert lived most of the time Kerrville. And as Robert reminds us in his brief, he paid her expenses, such as the mortgage on the Canyon Glenn residence, the utility bill, and the grocery bill, during this time. Under the circumstances, the district court did not abuse its discretion in concluding that Alicia exercised due diligence in earning sufficient income. *See Day*, 452 S.W.3d at 435.

*Duration*

Next, Robert argues that the district court abused its discretion by ordering him to pay maintenance for ten years because a shorter period would be reasonable for her to earn

sufficient income to meet her own reasonable needs. *See* Tex. Fam. Code § 8.054(a)(2) (requiring that maintenance order must be limited "to the shortest reasonable period that allows the spouse seeking maintenance to earn sufficient income to provide for the spouse's minimum reasonable needs . . . ."). Robert argues that there is insufficient evidence Alicia needs ten years because the record reflects that he paid all her expenses during the five-and-a-half years the divorce was pending because she "never attempted to gain full time employment." As we have already discussed, the undisputed evidence shows that the parties were attempting to reconcile during that time, and that Alicia took employment that reflected their mutual priority of having Alicia be around for E.G.R. Moreover, Alicia testified that even though she is concerned her teaching experience is twenty-seven years out of date, she plans to continue seeking out a teaching job while nannying. We conclude that the trial court did not abuse its discretion in ordering Robert to pay maintenance for ten years.

### *Amount of Award*

Finally, Robert argues that there is legally and factually insufficient evidence to support the amount of the award. First, he argues that the monthly payments from the equalization judgment and the maintenance award total $7,543.52 and that this amount far exceeds Alicia's estimated minimum reasonable needs. The equalization judgment, however, is part of the division of property rather than a means of support. *See id.* § 7.009(c)(2) ("In making a just and right division of the reconstituted estate under Section 7.001, the court may grant any legal or equitable relief necessary," including "awarding a money judgment in favor of the wronged spouse against the spouse who committed the actual or constructive fraud on the community."). Next, he argues that $3,000 is excessive because she usually makes between

"$500 and $1,000 per month" nannying and could have significantly more income if she takes a teaching job. But it is undisputed that Alicia has not received a decision on her two pending applications. In any event, her estimated teaching salary of $2,600–$3,000 plus the $3,000 maintenance payment would not equal her estimated minimum reasonable needs of $7,199.16. The district court did not abuse it discretion by ordering Robert to pay $3,000 in maintenance.

We overrule Robert's first issue.

## CONCLUSION

We affirm the district court's judgment.

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Kelly and Theofanis

Affirmed

Filed: October 6, 2023