**Opinion issued June 20, 2019**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-18-00463-CV**

———————————

**SHERRY ANTOINETTE SMITH, Appellant**

**V.**

**MOHAMMAD HAMID PAYANDEH, Appellee**

---

**On Appeal from County Court at Law No. 2**
**Galveston County, Texas**
**Trial Court Case No. 17-FD-2098**

---

**MEMORANDUM OPINION**

Sherry Antoinette Smith, acting pro se, appeals the divorce decree dissolving

the marriage between her and Mohammad Hamid Payandeh. In two issues, Smith

contends the trial court abused its discretion in granting Payandeh the exclusive right

to designate the primary residence of the parties' child, Z.K.P., and she asserts that

the trial court misinterpreted the effect of her invocation of her Fifth Amendment right against self-incrimination during trial.[1]

We affirm.

## Background

Smith and Payandeh were married in September 2014, and Z.K.P. was born on September 9, 2015. Smith also has four children from prior relationships, who lived with the couple.

Payandeh and Smith separated in January 2017 and began living in separate residences. Z.K.P. lived with Payandeh but would go to Smith's home for visitation. Payandeh would later testify that, on July 31, 2017, he went to Smith's home to pick up Z.K.P. from a visit. One of Smith's other children opened the door and let Payandeh in the apartment. Payandeh then saw that Smith was smoking "kush," an illegal substance.

Smith filed a petition for divorce in early August 2017. She requested to be named Z.K.P.'s sole managing conservator and the conservator with the right to designate Z.K.P.'s primary residence. She requested that Payandeh's possession of

---

[1]    In her opening brief, Smith also asserts that "the calculation of child support [she was ordered to pay in the decree] was not made within the parameters provided by the child support guidelines." She provided no further briefing regarding the assertion. In her reply brief, Smith writes that she "accepts the child support guidelines determination as it conforms with the monthly child support calculator at the Attorney General's website." Thus, Smith is not pursuing a challenge to the child-support award.

Z.K.P. be limited because she believed that he would attempt to take Z.K.P. out of the country. Payandeh filed a counterpetition, requesting "full custody" of Z.K.P. until the divorce was finalized.

The trial court signed temporary orders in September 2017 in which Payandeh and Smith were appointed Z.K.P.'s joint managing conservators. However, Smith was not permitted to have overnight possession of Z.K.P. She was given possession odd-week Fridays and Sundays from 9 a.m. to 5 p.m. and from 6 p.m. to 8 p.m. on Thursdays. Payandeh had possession of Z.K.P. at all other times.

The trial court conducted a bench trial in March 2018 with the parties presenting evidence relating to issues of conservatorship, possession, and child support. Payandeh requested that he be named the managing conservator who would establish Z.K.P.'s primary residence, and he requested that Smith's possession of Z.K.P. be limited to daytime visits as they had been under the temporary orders.

Payandeh testified that he is originally from Iran and had immigrated to the United States in 1984. He stated that he served as an officer in the United Sates Navy, and he is a permanent resident of the United States. During Payandeh's testimony, it was pointed out that Smith had expressed concern that Payandeh would attempt to take Z.K.P. to Iran. When asked about this, Payandeh stated that he cannot return to Iran under Iran's current regime because of his service as an officer in the United States Navy. Payandeh also testified that neither he nor Z.K.P. has a passport.

He said that he has no plans to get a passport for Z.K.P. When asked, Payandeh said that he had no problem with the trial court enjoining him from taking Z.K.P. out of the United States.

Payandeh stated that he works for the Galveston transit authority, driving bus and the city trolley. He earns between $600 and $1,000 per week. While Payandeh works, Z.K.P. attends daycare. Payandeh's mother also lives with him and helps cares for Z.K.P.

In addition, Payandeh's neighbor testified at trial. She stated that she is a friend of Payandeh, sees Z.K.P. every day, and babysits Z.K.P. when needed. She said she is a stay-at-home mom, who is available anytime to help with Z.K.P.

Payandeh testified that he had concerns for Z.K.P.'s safety when the child was in Smith's possession. Payandeh stated that, on July 31, 2017, he went to Smith's apartment to pick up Z.K.P. from visitation. He said that, when Smith did not answer phone, one of Smith's children let him in the apartment. When he entered, Payandeh saw signs that Smith had been smoking "kush." Payandeh saw Smith exiting the bathroom with an ashtray containing a blunt. Smoke was coming out of the bathroom behind Smith, and she was spraying deodorizer. Payandeh said Smith looked like she had just gotten out of bed. He testified that he had seen Smith smoke the illegal substance other times as well. Payandeh stated that he was also concerned about Smith's brother, who comes to Galveston on the weekends. Payandeh said that he

4

has seen the brother in possession of kush and has seen Smith and her brother smoke the drug. Payandeh indicated that he continues to see the brother's car in front of Smith's residence.

Payandeh also testified that he was concerned about who cares for Z.K.P. when he is in Smith's possession. He stated that he knew "for a fact that [Smith] runs the streets. The minute somebody calls, she's going to be out there running to the bars." Payandeh testified that he has seen Smith leaving bars at night when he he has been driving the trolley, and he indicated that Smith had a history of going out to drink when he lived with her.

Payandeh said that he was concerned that Smith left the children unsupervised when she was not home. Smith's four children from prior relationships were ages 16, 14, 11, and 9 at the time of trial. Payandeh said that Smith would leave the younger children in the care of her two teenage daughters, but the daughters would not stay at home to watch the younger children, leaving them unattended.

Payandeh explained that Smith's 11-year-old son, S.M., has autism and requires supervision. Payandeh said that he had safety concerns related to S.M. being unsupervised. He testified that S.M. does not understand the concept of safety. He explained that S.M. tries to cook but does not know how to cook safely. Payandeh's testimony indicated that he was concerned that S.M.'s cooking may start a fire. Payandeh stated that S.M. has a history of turning on the stove and then leaving.

5

Payandeh also recalled that S.M. had "burned down" six or seven microwaves, filling the house with smoke.

Police reports were also admitted into evidence. One report showed that, two months before trial, Smith's 14-year-old daughter had been picked up by police at 1:00 a.m. while riding in a car driven by a 14-year-old unlicensed driver along with six other 13 and 14-year old juveniles. Another police report, dated one month before trial, stated that Smith's 14-year-old daughter, along with two teenage friends, was reported to have attacked another teenage girl. The report stated that Smith had driven her daughter and the two friends to the location where they attacked and assaulted the girl. Smith had waited in the car during the assault and n had then driven her daughter and her two friends away from the scene.

Payandeh also testified that Smith had a history of disappearing for periods of time. He said that, at least three times a year, Smith would say that she was "done with the kids." She would leave and fly to different locations, such as Ohio or Virginia, and be away for one or two weeks. He testified that, after they had separated, Smith went to Pennsylvania in June 2017. When asked who babysat Smith's four children while she was gone, Payandeh responded, "The four children, they were just at the house by themselves. Neighbors. I would stop, bring food, send food. They would call me. Until she put a stop to it, the kids were still calling me at that time; and she told them to stop communicating with me."

Payandeh also testified that Smith prioritizes spending money on items such as makeup and getting her nails done before buying food for her children. He said that Smith's children would call him, "saying there was no food, so I would send them pizza and food." Payandeh reported his concerns regarding Smith's children to CPS, but the agency "ruled out" the report after speaking with Payandeh and Smith.

Two other police reports show that Smith made unfounded allegations of abuse against Payandeh. Smith reported to police that, when she got Z.K.P. from Payandeh for a visit, Z.K.P. had a burn mark on his leg. The report indicated that the mark was not a burn but a bug bite that Z.K.P. had scratched. The police report noted that a call to CPS had determined that Smith had been making unfounded allegations against Payandeh to that agency as well. The report stated that the investigating police officer spoke with a CPS investigator who told him that Smith had recently "lost custody" of Z.K.P. and that the child was staying with Payandeh. The CPS investigator told police that Smith had made a report to CPS against Payandeh that was determined to be false. The CPS investigator indicated that the making of false reports was "an ongoing problem they have with [Smith]."

Another police report shows that Smith made an unfounded allegation that Payandeh had sexually abused Z.K.P. The report indicates that, after Smith made the allegation, she was directed to take Z.K.P. to the hospital. The police report states that "Smith was . . . making blind accusations of Sexual Abuse and insisted that

7

UTMB perform a SANE exam, an intrusive exam used to collect biological evidence of sexual assault." The investigating police officer reported that he spoke with the attending physician at the hospital and that the doctor had "advised that there was no physical evidence of sexual abuse and it was his recommendation not to perform a SANE exam." The investigating officer also spoke to Payandeh who said that he believed that Smith had made the allegation "because earlier in the day, [Payandeh] was awarded full custody of [Z.K.P.] by the Family Court in Galveston." The investigator concluded that there was no evidence that Payandeh had injured the child, and the "case was cleared as unfounded."

Smith also testified at trial. She testified that she believed it was in Z.K.P.'s best interest for her to be named as his primary conservator. When asked why, Smith stated that Payandeh was not providing Z.K.P. with proper medical care. She testified that Z.K.P. had been diagnosed with "developmental delay." She testified that she sought "early intervention" services for Z.K.P. to work with him on speech and cognitive issues and that Payandeh was not seeking any treatment for Z.K.P.'s developmental delay. She said that Payandeh knew about the diagnosis but was "in denial" about it.

During his testimony, Payandeh was asked if Z.K.P. had any medical issues of concern, and Payandeh testified that Z.K.P. had no medical issues that concerned

him. Payandeh's neighbor, who babysits Z.K.P., testified that she was not aware that Z.K.P. had any medical conditions or cognitive issues.

Smith testified that she is employed by the Galveston school district, earning $9.50 an hour. She said that, if she was named as the primary conservator, Z.K.P. would go to daycare while she worked. Smith confirmed that she has four other children from prior relationships and that her 11-year-old, S.M., has autism. She stated that S.M. has never harmed any of her other children, including Z.K.P.

Smith also denied that Payandeh had caught her smoking an illegal drug on July 31, 2017 when he picked up Payandeh. She testified that she had a negative drug test the month before trial and in October 2017 when she started her job with the school district.

Smith acknowledged that her daughter had been involved in fights, but she denied that she facilitated her daughter to take part in assaulting another girl. She testified that her daughter was the victim in the fights and had been subjected to bullying.

During cross-examination, Smith was presented with a printout of a GoFundMe page in which funds were being solicited for Smith following Hurricane Harvey. The page said, "I have small children and I'm in need of support restoring my life back together after the loss of my vehicle that was flooded and other damages faced during Hurricane Harvey and being trapped in a house for 16 hours with barely

9

any food or water." She said that she had not created the GoFundMe page. When questioned whether she had authorized its creation, Smith stated, "I wish not to disclose this information. . . . I have an attorney for a criminal case because of this; and so he's asking questions he can use against me, so I'd rather not discuss this if you don't mind." Smith then invoked her Fifth Amendment right against self-incrimination with respect to questioning about the GoFundMe page. The trial court stated, "You need to be aware, however, that in a civil matter or a family law matter, when you invoke your right, then the Court can automatically assume that the information is correct. Just so you know."

When Payandeh's requested that the GoFundMe page be admitted, Smith's attorney objected that "that the foundation has not been properly laid, Your Honor. She did state that she did not create the document." The trial court responded, "She also stated that it was created for her; and when he asked if the creation of the document was at her direction or with her authorization—rather—she invoked her rights. So, the Court can assume that that document was created at her authorization." The GoFundMe page was admitted into evidence. When asked whether she owned the car referenced in the GoFundMe page, Smith said that she did not own the vehicle. Smith then refused to answer further questions about the GoFundMe page.

The trial court granted the divorce based on insupportability and dissolved the marriage between Smith and Payandeh. The divorce decree names Smith and Payandeh as Z.K.P.'s joint managing conservators. Payandeh was designated as the parent with the exclusive right to determine Z.K.P.'s primary residence. The decree ordered that Smith have supervised visitation with Z.K.P. which would then "step up" to unsupervised possession; however, Smith was not given the right to overnight possession of Z.K.P.[2] Smith was also ordered to pay Payandeh child support of $197.88 per month. Smith requested findings of fact and conclusions of law; however, the request was untimely, and none were filed.

Smith now appeals.[3]

## Right to Establish Primary Residence and Possession

In her first issue, Smith contends that the trial court abused its discretion by appointing Payandeh as the joint managing conservator with the exclusive right to establish Z.K.P.'s primary residence.

## A.    Standard of Review

---

[2]    At the end of trial, the trial court told Smith that she could file motion to modify regarding possession at a later time.

[3]    Although she was represented by counsel in the trial court, Smith appears pro se on appeal.

11

We review a trial court's determination of conservatorship, including a determination of which conservator will have the exclusive right to establish the child's primary residence, under an abuse-of-discretion standard. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *Strong v. Strong*, 350 S.W.3d 759, 765 (Tex. App.—Dallas 2011, pet. denied). We also review determinations of possession and access under an abuse-of-discretion standard. *Moreno v. Perez*, 363 S.W.3d 725, 737 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see In re J.A.J.*, 243 S.W.3d at 616. A trial court abuses its discretion if it acts without reference to guiding rules or principles (legal issues), or it acts arbitrarily or unreasonably (factual issues). *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex.1990); *Gardner v. Gardner*, 229 S.W.3d 747, 751 (Tex. App.—San Antonio 2007, no pet.).

When applying an abuse-of-discretion standard, challenges to the legal and factual sufficiency of the evidence are not independent grounds of error but are factors used in assessing whether the trial court abused its discretion. *Ayala v. Ayala*, 387 S.W.3d 721, 726 (Tex. App.—Houston [1st Dist.] 2011, no pet.). To determine whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we consider (1) whether the trial court had sufficient evidence upon which to exercise its discretion and (2) whether it erred in its application of that discretion. *Bush v. Bush*, 336 S.W.3d 722, 729 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Under the first prong, we use

the traditional standards of review for legal and factual sufficiency. *Id.*; *see Lenz v. Lenz*, 79 S.W.3d 10, 13 (Tex. 2002) (setting forth standard of review for legal sufficiency); *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (setting forth standard of review for factual sufficiency). Under the second prong, we consider whether, based on the evidence, the trial court's decision was arbitrary, unreasonable, or without reference to guiding rules or principles. *Bush*, 336 S.W.3d at 730. When, as here, there are no findings of fact and conclusions of law, the trial court's judgment implies all fact findings necessary to support it, and we must affirm the judgment if it can be upheld on any legal theory. *See In re W.E.R.*, 669 S.W.2d 716, 717 (Tex. 1984); *George v. Jeppeson*, 238 S.W.3d 463, 468 (Tex. App.— Houston [1st Dist.] 2007, no pet.).

## B. Analysis

When appointing joint managing conservators, the trial court must designate the conservator who has the exclusive right to determine the primary residence of the child. TEX. FAM. CODE § 153.134. In determining which joint conservator should have the exclusive right, the best interest of the child is the court's primary consideration, as it is in determining all "issues of conservatorship and possession of and access to the child." *Id.* § 153.002. Trial courts generally have wide latitude in determining what is in a child's best interest, *Gillespie v. Gillespie*, 644 S.W.2d

13

449, 451 (Tex. 1982), and may use a non-exhaustive list of factors to aid in the determination, *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The factors include (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the act or omissions of the parent. *Id.* These factors are not exhaustive, and no single factor is controlling. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The factfinder is not required to consider all the factors, and the presence of a single factor may, in some instances, be adequate to support a best-interest finding. *M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied).

Smith asserts that there is "no evidence" to support the trial court's implied finding that appointing Payandeh as the conservator with the exclusive right to determine the child's primary residence was in Z.K.P.'s best interest. The record does not support Smith's assertion.

14

Evidence was presented supporting the trial court's decision to grant Payandeh the exclusive right to determine two-year-old Z.K.P.'s residency. Specifically, evidence was presented relevant to the following *Holley* factors: the emotional and physical needs of Z.K.P. now and in the future; the emotional and physical danger to Z.K.P. now and in the future; parental abilities; and the stability of the parents' homes. Pertinent to these factors, the evidence showed the following:

- Two-year-old Z.K.P. had resided with Payandeh since Payandeh and Smith separated in January 2017.

- Payandeh is a veteran of the United States Navy. He is employed by the Galveston transit authority, making $600 to $1,000 per week.

- Z.K.P. is in daycare while Payandeh is at work. Payandeh's mother lives with him and assists in caring for Z.K.P. A neighbor babysits Z.K.P. when needed, and she testified that she is always available to help with Z.K.P.

- Payandeh stated that Z.K.P. does not have any medical issues of concern. The neighbor who babysits Z.K.P. testified that she has not noticed that Z.K.P. has any cognitive or medical issues.

- Payandeh discovered in July 2017 that Smith was smoking kush while Payandeh was in her care. Payandeh also has seen, on other occasions, Smith and her brother, who visits Smith on weekends, smoke kush.

- Payandeh indicated that Smith leaves her children unattended to go out to bars at night. When she is not home, Smith leaves her younger children in the care of her two teenage daughters, who are not reliable caregivers. The daughters leave the younger children unattended, including Smith's 11-year-old son, S.M., who has autism. S.M. has a history of leaving the stove on and causing fires in the microwave.

- Payandeh testified that, at least three times a year, Smith would say that she was "done with the kids." She would leave and fly to different locations, such as Ohio or Virginia, and be away for one or two weeks.

- Smith prioritizes spending money on personal items for herself over buying food for her children. The children would call Payandeh, asking him to bring them food.

- A police report indicated Smith's 14-year-old daughter, and the daughter's two friends, were accused of assaulting another girl. The police report indicated that Smith drove her daughter and the other two girls to and from the scene of the assault.

- Smith also made reports to the police and CPS that Payandeh had assaulted Z.K.P., which were determined to be unfounded.

Smith points to her testimony indicating that Z.K.P. has medical and developmental needs and that she had enrolled Z.K.P. "in a special program." Smith also points to evidence showing that she is employed and that Payandeh made a report to CPS against her that was "ruled out."

In a bench trial, the trial court is the sole judge of the credibility of the witnesses, assigns the weight to be given their testimony, may accept or reject all or any part of their testimony, and resolves any conflicts or inconsistencies in the testimony. *Bush*, 336 S.W.3d at 730. The trial court is best able "to observe the demeanor and personalities of the witnesses and [to] 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.). Thus, we will not

16

re-weigh the evidence bearing on the trial court's implied best-interest determination in this case. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

Having reviewed the evidence in this case under the appropriate standards, we conclude the record contains sufficient evidence for the trial court to have exercised its discretion to appoint Payandeh as the conservator with the exclusive right to designate Z.K.P.'s residence, and the trial court's decision was reasonable. *See Strong v. Strong*, 350 S.W.3d at 764–68 (concluding that, although some evidence favored father, there was evidence to support award of primary custody to mother). We hold that the trial court did not abuse its discretion in appointing Payandeh as the primary conservator.

We note that Smith also generally states in her brief that that there is no evidence that the "custody arrangement" was in two-year-old Z.K.P.'s best interest. In making this assertion, Smith cites Family Code Section 153.254(a), which requires the trial court to consider certain relevant factors before rendering an order appropriate for possession of a child who is less than three years old, TEX. FAM. CODE. § 153.254(a), because a standard possession order does not apply to children under three years of age, *id.* § 153.251(d).

Smith asserts that there was "no evidence" of the factors found in Section 153.254. However, Smith has not expressly challenged the portion of the trial court's decree limiting her possession of Z.K.P. to supervised visitation that steps up to

17

unsupervised possession, but which does not allow Smith overnight possession of Z.K.P. Instead, her first issue expressly challenges the trial court's appointment of Payandeh as primary conservator. Section 153.254(a) does not apply to the determination of whether the trial court properly exercised its discretion in naming Payandeh as the conservator with the exclusive right to establish Z.K.P.'s primary residence.

In any event, even if Smith's brief can be read to challenge the portion of the decree governing possession of Z.K.P., the trial court did not abuse its discretion in limiting Smith's possession as it did in the decree. When determining what possession to allow Smith, Section 153.254(a) required the trial court to consider, among other factors, the caregiving provided to Z.K.P. before and during the current suit; the effect on Z.K.P. that may result from separation from either party; Payandeh's and Smith's availability and willingness to personally care for the child; Payandeh's and Smith's physical, medical, emotional, economic, and social conditions; Z.K.P.'s need for continuity of routine; and, Payandeh and Smith's ability to share in the responsibilities, rights, and duties of parenting. *See id.* § 153.254(a). The trial court's limitation on Smith's possession of Z.K.P. was permissible under the circumstances. The evidence discussed above, supporting the primary conservatorship appointment, also supports a determination that it would be in Z.K.P.'s best interest to limit Smith's possession in the manner ordered in the

decree. *See In re J.M.M.*, 549 S.W.3d 293, 298 (Tex. App.—El Paso 2018, no pet.) (holding trial court's total denial of possession and access to child was permissible because some evidence showed restriction was in child's best interest).

We overrule Smith's first issue.

## Asserting Fifth Amendment Privilege

In her second issue, Smith complains about the remarks made by the trial court when Smith asserted her Fifth Amendment right not to testify when asked about the GoFundMe page.

In a civil case, a factfinder may draw negative inferences from a party's assertion of the Fifth Amendment privilege against self-incrimination. *See* TEX. R. EVID. 513(c); *Tex. Capital Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 779 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). Refusal to answer questions by asserting the privilege is relevant evidence from which the finder of fact in a civil action may draw whatever inference is reasonable under the circumstances. *In re Z.C.J.L.*, No. 14-13-00115-CV, 2013 WL 3477569, at *10 (Tex. App.—Houston [14th Dist.] July 9, 2013, no pet.) (mem. op.).

During trial, Payandeh questioned Smith about the GoFundMe page requesting funds for Smith for damages she allegedly suffered due to Hurricane Harvey. Smith stated that there was a criminal case pending against her related to

the GoFundMe page, and she asserted her Fifth Amendment right not to testify about it. The trial court then informed Smith, "You need to be aware, however, that in a civil matter or a family law matter, when you invoke your right, then the Court can automatically assume that the information is correct."

On appeal, Smith frames her issue as follows: "[I]t was error for the trial court to rule that because of [her] assertion of the Fifth Amendment on a collateral issue that had nothing to do with her fitness as a parent 'the Court can automatically assume that the information is correct.'" Although it is not entirely clear, Smith appears to complain of the trial court's imprecise statement that it could "automatically assume that the information is correct" rather than informing Smith that the court could draw negative inferences from her assertion of her Fifth Amendment privilege.

Smith did not raise the complaint in the trial court regarding the trial court's handling of the GoFundMe page that she now raises on appeal. To preserve a complaint for appellate review, a party must present to the trial court a timely request, motion, or objection with sufficient specificity as to make the trial court aware of the complaint, unless the specific grounds are apparent from the context. *See* TEX. R. APP. P. 33.1(a). Thus, Smith's complaint has not been preserved.[4] *See*

---

[4]    Even if error had been preserved and found, we note that there was ample evidence, aside from the GoFundMe page and any adverse inferences that could have been drawn from it, to support the trial court's exercise of discretion with respect to

*id.*; *cf. C.M. v. Tex. Dep't of Family & Protective Servs.*, No. 03-18-00389-CV, 2018 WL 5668298, at *3 (Tex. App.—Austin Nov. 1, 2018, no pet.) (mem. op.) (holding complaint regarding trial judge's alleged comment on weight of witness's testimony not preserved on appeal because no objection made in trial court to judge's comments).

We overrule Smith's second issue.

## Conclusion

We affirm the trial court's final decree of divorce decree.


Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Landau.

---

naming Payandeh as primary conservator and determining possession, as discussed above.