**Opinion issued September 30, 2021**



In The

# Court of Appeals

### For The

## First District of Texas

_____

### NO. 01-19-00722-CV
_____

## IN THE MATTER OF THE MARRIAGE OF ALLAN RAY COMSTOCK AND MINDY LEE COMSTOCK

On Appeal from the County Court at Law No. 1
Galveston County, Texas
Trial Court Case No. 15-FD-3019

## O P I N I O N

The trial court dissolved the marriage of appellant, Mindy Lee Comstock, and

appellee, Allan Ray Comstock, and divided their marital estate. The trial court also

named Allan as sole managing conservator over the parties' two children, ordered

Mindy to pay monthly child support, and ordered Mindy to pay a share of Allan's

attorney's fees. Mindy moved for a new trial and for a modification of the divorce decree, but the trial court denied both motions.

In four issues on appeal, Mindy contends that (1) she is entitled to a new trial because the trial court erroneously denied her jury demand and erroneously determined that Mindy waived a jury; (2) she is entitled to a new trial because the trial court erroneously failed to transcribe and include in the record interviews with the children and by failing to consider newly discovered evidence; (3) the trial court abused its discretion in setting the amount of monthly child support payments by considering assets of Mindy's parents; and (4) the trial court ordered Mindy to pay an excessive amount of Allan's attorney's fees. We affirm.

**Background**

Mindy and Allan married in 2001. They have two children together: a daughter born in August 2001 and a son born in July 2003. At the time of the trial in this case, both children were still minors. The children have since turned eighteen.

Allan first filed for divorce in November 2014. This proceeding was non-suited in May 2015. Allan filed for divorce a second time in December 2015 and alleged that the marriage had become insupportable. In this petition, Allan requested that the parties be named joint managing conservators of their two children, but he did not specifically request that either party be granted the exclusive right to designate the children's primary residence.

Mindy filed a counterpetition for divorce requesting that the parties be named joint managing conservators, that the trial court grant her the exclusive right to designate the children's primary residence, and that the court order Allan to pay child support. Allan amended his divorce petition in April 2016 and again in February 2017. In both amended petitions, Allan sought joint managing conservatorship, the exclusive right to designate the children's primary residence, and child support payments from Mindy.

According to the clerk's record, the case was set for trial seven times. Allan testified that the first three settings were jury trial settings, but the third setting—scheduled for February 14, 2017—was converted to a bench trial. That bench trial setting was cancelled and then re-scheduled for April 11, 2017. On March 31, Mindy's counsel filed a motion to withdraw and for continuance, both of which the trial court granted on April 11, 2017. The bench trial was reset to May 16, 2017.

Shortly after her attorney withdrew, on April 14, 2017, Mindy's new attorney filed a jury demand and paid the jury fee. Allan moved to strike this jury demand, arguing that, under the facts of the case, the demand was unreasonable and was solely for the purpose of delay. He also argued that the parties had previously agreed to a bench trial and had obtained a prior bench trial setting based upon that agreement. Allan did not attach any evidence to the motion.

The trial court held a hearing on the motion on May 5, 2017. At the hearing, Allan's counsel emphasized that Mindy had walked out of court ordered mediations, cancelled other mediation settings, and required the trial to be reset multiple times. He further argued that granting a jury trial would negatively affect the court's docket. Mindy's counsel responded that her jury request was timely, and that the court could not deny her a jury trial as a sanction for litigation conduct. The trial court did not issue a written order on the motion to strike, but instead pronounced that Mindy's "motion for a jury is denied." The trial court also stated on the record:

> And I think just from what I've seen, it's been a long list of dilatory tactics in this case. I don't think I've ever seen so much in the six years I've been here or prior to that when I was in private practice. So, Motion For a Jury is denied on that. And certainly, if we did have a Jury, it would absolutely disrupt the Court's docket because today's the 5th. It's set for the 17th. So you'd probably be on the Jury trial docket sometime in September at this rate.

Mindy's counsel immediately filed a mandamus petition with this Court requesting that we issue a writ of mandamus compelling the trial court to hold a jury trial. We granted Mindy's motion to stay the bench trial until the petition was resolved. While that petition was pending, the trial court held a hearing at which the court permitted Allan's counsel to create a bill of review to support the denial of the jury trial. At that hearing, Allan's counsel asked the Court to take "judicial notice of the November 14th, 2016, docket control order signed by both parties agreeing to a bench trial." The Court took judicial notice of that order, and it allowed Allan's

4

counsel to present a number of exhibits. Allan did not offer the November 14, 2016 docket control order as an exhibit.

Ultimately, a panel of this Court denied Mindy's petition for writ of mandamus without a substantive opinion and lifted the stay. *See In re Comstock*, No. 01-17-00346-CV, 2017 WL 3634066 (Tex. App.—Houston [1st Dist.] Aug. 24, 2017, orig. proceeding) (mem. op.). The trial court then held a bench trial over eleven days in July, October, November, and December 2018. The trial court heard extensive evidence concerning the children, who were seventeen and fifteen at the time, their mental health, concerns about their behavior, their academic performance, their school attendance, and the effect the prolonged divorce proceedings had had on them.

The trial court also heard extensive evidence concerning the parties' financial resources and spending habits. Mindy, who had previously worked as a nurse, had received Social Security disability payments since October 2015. At the time of trial, she received $1,900 per month in disability benefits. Mindy's parents, however, are wealthy and, throughout the parties' marriage and during the pendency of the divorce, they repeatedly assisted the parties with their finances and made payments for the benefit of the children. The trial court heard evidence that during 2015 through 2018, the years the divorce was pending, Mindy spent over $100,000 each year in expenses for the children. Her parents assisted her in paying nearly all her

bills, including extracurricular activities for the children, international vacations for the children, and a vehicle for her daughter. Although no evidence was presented concerning the exact amount Mindy's parents had paid on her behalf and the children's behalf, Allan, Mindy, and Mindy's mother all testified that the amounts were substantial, totaling several hundred thousand dollars.

The trial court also heard evidence that Mindy was the beneficiary of two trusts, including a trust created by a great aunt who died in 2017, but neither Mindy nor her mother, the trustee of the trust, presented testimony or financial records concerning the amount of the share to which Mindy was entitled. After the close of trial, the trial court conferred in chambers with both children. It is undisputed that no record was made of these interviews.

In May 2019, the trial court signed a final decree of divorce that dissolved the parties' marriage and divided their marital estate. In the decree, the trial court stated, "A jury was waived, and questions of fact and of law were submitted to the Court." The trial court appointed Allan as sole managing conservator and Mindy as possessory conservator of the children. The trial court granted Allan the exclusive right to designate the primary residence of the children within Galveston County and contiguous counties and granted Mindy a standard possession order. The trial court also ordered Mindy to pay $1,576.86 per month in child support while both of their children were under the age of eighteen and $1,261.49 per month in child support

6

after their daughter turned eighteen and while their son was still under eighteen. The trial court further ordered Mindy to pay $118,282.40 in Allan's attorney's fees, $20,000 in appellate attorney's fees "conditioned on Mindy Lee Comstock's pursuit of an ultimately unsuccessful appeal," and $34,600 in fees for the children's amicus attorney.

In its findings of fact and conclusions of law, the trial court made numerous findings concerning Mindy's net resources, including findings that she received more than $100,000 in gifts from her parents each year, that she expected to continue receiving such gifts, and that her net resources averaged more than $11,250 per month. The trial court also found that Mindy "intentionally caused as much delay as possible in resolving this case" and "intentionally caused the costs and expenses of this case to increase as much as possible." The court further found that "[t]he parties agreed to withdraw this case from the jury docket and place it on the bench trial docket when they agreed to a continuance and new Docket Control Order on November 14, 2016."

Mindy moved for a new trial and to modify, correct, and reform the divorce decree. Among other contentions, Mindy argued that she was entitled to a new trial because the trial court erroneously refused her jury demand and erroneously refused to transcribe the interviews with the children, contrary to statutory authority requiring that such interviews be transcribed by the court reporter if a parent so

7

requests. Mindy also argued that newly discovered evidence justified a new trial, specifically, evidence that the children, while living with Allan after the trial and before rendition of the decree, had excessive unexcused absences and tardiness from school. She argued that this evidence called into question whether it was in the children's best interests for Allan to have sole managing conservatorship.

The trial court held a hearing on Mindy's post-decree motions and denied the motions. This appeal followed.

**Jury Demand**

In her first issue, Mindy argues that the trial court erred by denying her jury demand and by concluding, in the final divorce decree, that she waived her right to a jury. We affirm because Mindy—the appellant in this case—has not carried her burden to create an appellate record that includes the agreed order that is the basis for the waiver finding. Without such a record, we cannot find reversible error.

*A.* *Jurisdiction*

Before turning to the question whether Mindy has demonstrated reversible error on the jury demand issue, we first must examine whether we have jurisdiction to decide that issue.

Subject-matter jurisdiction is essential to this Court's ability to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). It is well settled that appellate courts are required to consider their jurisdiction sua

sponte. *Freedom Commc'ns, Inc. v. Coronado*, 372 S.W.3d 621, 624 (Tex. 2012) (per curiam); *Malone v. PLH Grp., Inc.*, 570 S.W.3d 292, 296 (Tex. App.—Houston [1st Dist.] 2018, no pet.). Appellate courts "always have jurisdiction to determine their own jurisdiction." *Malone*, 570 S.W.3d at 296; *see Houston Mun. Emps. Pension Sys. v. Ferrell,* 248 S.W.3d 151, 158 (Tex. 2007).

Mootness deprives the court of jurisdiction. *See Heckman v. Williamson Cty.*, 369 S.W.3d 137, 162 (Tex. 2012); *Harlow Land Co. v. City of Melissa*, 314 S.W.3d 713, 716 (Tex. App.—Dallas 2010, no pet.) ("If a case becomes moot, the parties lose standing to maintain their claims, depriving the appellate court of subject matter jurisdiction."). This Court is prohibited from deciding a moot controversy or rendering an advisory opinion. *Tesco Corp. (US) v. Steadfast Ins. Co.*, No. 01-13-00091-CV, 2015 WL 456466, at *2 (Tex. App.—Houston [1st Dist.] Feb. 3, 2015, pet. denied) (mem. op.); *see Nat'l Collegiate Athletic Ass'n v. Jones*, 1 S.W.3d 83, 86 (Tex. 1999) ("Appellate courts are prohibited from deciding moot controversies."); *City of Farmers Branch v. Ramos*, 235 S.W.3d 462, 469 (Tex. App.—Dallas 2007, no pet.) (noting that court must avoid rendering advisory opinions by only deciding issues presenting "a live controversy at the time of the decision").

A controversy "can become moot at any time, including on appeal," and "courts have an obligation to take into account intervening events" that may render

the controversy moot. *Heckman*, 369 S.W.3d at 166–67. A case is moot if there ceases to be "a justiciable controversy between the parties—that is, if the issues presented are no longer 'live,' or if the parties lack a legally cognizable interest in the outcome." *Id.* at 162. "Put simply, a case is moot when the court's action on the merits cannot affect the parties' rights or interests." *Id.*

Here, Mindy is seeking to overturn the trial court's denial of a jury trial on the custody issues pertaining to the two children. Both children have now turned eighteen, achieving the age of majority in Texas. Once the child has become an adult, "there is no live controversy" with respect to custody, possession, and access. *D.C. v. Tex. Dep't of Family & Protective Servs.*, No. 03-11-00453-CV, 2012 WL 1403333, at *1 (Tex. App.—Austin Apr. 19, 2012, no pet.) (mem. op.); *Medrano v. Zapata*, No. 03-12-00131-CV, 2013 WL 6921500, at *4 (Tex. App.—Austin Dec. 31, 2013, no pet.) (mem. op.); *In re J.D.*, No. 04-19-00239-CV, 2020 WL 4607015, at *1 (Tex. App.—San Antonio Aug. 12, 2020, no pet.) (mem. op.) ("When a child turns eighteen years old, issues of conservatorship become moot."). Issues of conservatorship of Mindy and Allan's children are therefore moot.

That is not the end of the matter, however. When the custody determination implicates the financial obligations imposed by the final decree that accrued prior to the child's emancipation—such as attorney's fees and the amount of previously-accrued child support—"a live controversy remains to such extent." *In re J.O.A.*,

10

No. 14-14-00968-CV, 2016 WL 1660288, at *4 (Tex. App.—Houston [14th Dist.] Apr. 26, 2016, no pet.) (mem. op.); *Medrano*, 2013 WL 6921500, at *4. Because Mindy has appealed the attorney's fees award and the child support obligation imposed by the final decree that preceded the children's emancipation, we have jurisdiction over this appeal. *Compare Medrano*, 2013 WL 6921500, at *4, and *In re J.O.A.*, 2016 WL 1660288, at *4, with *In re E.H.*, No. 2-07-343-CV, 2008 WL 2404490, at *1 (Tex. App.—Fort Worth June 12, 2008, no pet.) (mem. op.) (per curiam) (dismissing appeal from order awarding permanent managing conservatorship to DFPS as moot because child turned eighteen during pendency of appeal, but noting that trial court had not ordered mother to pay child support), and *D.C.*, 2012 WL 1403333, at *1 & n.1 (holding same and noting that appellant did not complain on appeal about imposition of child support obligation).

## B. *Governing Law*

With two exceptions not applicable to this case, a party to a suit affecting the parent-child relationship ("SAPCR") may demand a jury trial. *See* TEX. FAM. CODE § 105.002(a)–(b). A party is entitled to a jury verdict—and the trial court may not contravene a jury verdict—on several issues, including (1) the appointment of a sole managing conservator; (2) the appointment of joint managing conservators; (3) the appointment of a possessory conservator; and (4) the determination of which joint managing conservator has the exclusive right to designate the primary residence of

11

the child. *Id.* § 105.002(c)(1); *In re Reiter*, 404 S.W.3d 607, 609 (Tex. App.—Houston [1st Dist.] 2010, orig. proceeding). The trial court may not submit to a jury questions on the issues of child support, specific terms or conditions of possession of or access to the child, or any rights or duties of a conservator other than which joint managing conservator has the exclusive right to designate the primary residence of the child. TEX. FAM. CODE § 105.002(c)(2).

The Texas Constitution establishes that the "[t]he right of trial by jury shall remain inviolate." TEX. CONST. art. I, § 15; *Gen. Motors Corp. v. Gayle*, 951 S.W.2d 469, 476 (Tex. 1997) (orig. proceeding) ("The right to jury trial is one of our most precious rights, holding 'a sacred place in English and American history.'") (quoting *White v. White*, 196 S.W. 508, 512 (Tex. 1917)); *City of Garland v. Dallas Morning News*, 969 S.W.2d 548, 558 (Tex. App.—Dallas 1998) ("Denials of the right to a jury trial are closely scrutinized."), *aff'd*, 22 S.W.3d 351 (Tex. 2000). That right is not absolute, however. In civil cases, a party can procedurally forfeit the right to a jury trial by failing to timely make a jury demand or by failing to pay the jury fee. *See* TEX. R. CIV. P. 216; *In re Wells Fargo Bank Minn. N.A.*, 115 S.W.3d 600, 606–07 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding [mand. denied]).

Rule 216 is key to determining whether a party has procedurally forfeited a jury trial by making an untimely jury demand. Rule 216 states that "[n]o jury trial shall be had in any civil suit, unless a written request for a jury trial is filed with the

12

clerk of the court a reasonable time before the date set for trial of the cause on the non-jury docket, but not less than thirty days in advance." TEX. R. CIV. P. 216; *In re M.M.*, 980 S.W.2d 699, 702 (Tex. App.—San Antonio 1998, no pet.) ("In order to secure the right to a jury trial, the applicant must make a written request to the clerk of the court and pay the jury fee.").

A jury demand filed in advance of the thirty-day deadline provided for in Rule 216 "is presumed to have been made a reasonable time before trial." *Halsell v. Dehoyos*, 810 S.W.2d 371, 371 (Tex. 1991) (per curiam); *In re A.L.M.-F.*, 564 S.W.3d 441, 444 (Tex. App.—Waco 2017), *aff'd*, 593 S.W.3d 271 (Tex. 2019). However, trial courts are not required to honor every jury request simply because it is made more than thirty days before trial. *Girdner v. Rose*, 213 S.W.3d 438, 443 (Tex. App.—Eastland 2006, no pet.). The adverse party may rebut the presumption of reasonableness by showing that granting the jury demand would operate to injure the adverse party, disrupt the court's docket, or impede the ordinary handling of the court's business. *Halsell*, 810 S.W.2d at 371; *see In re A.L.M.-F.*, 564 S.W.3d at 444; *Girdner*, 213 S.W.3d at 443–44. Trial courts have discretion to determine what is a "reasonable" amount of time based on the individual circumstances of each case. *Girdner*, 213 S.W.3d at 443.

Separate and apart from Rule 216, parties can waive a jury trial by agreement. *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129–33 (Tex. 2004) (orig.

proceeding); *see also In re Hulcher Servs., Inc.*, 568 S.W.3d 188, 190 (Tex. App.—

Fort Worth 2018, no pet.) (holding that Rule 11 agreement waived jury trial for

second trial but not third trial following remand); *In re Wells Fargo Bank Minn.*, 115

S.W.3d at 606 (noting that parties can waive right to jury trial by "agreeing to a

bench trial"). Rule 11 is designed to eliminate misunderstandings and controversies

that accompany verbal assurances; as reduced to writing, the agreements therefore

"speak for themselves." *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 651 (Tex. 2007);

*Birdwell v. Cox*, 18 Tex. 535, 537 (1857). The trial court has a ministerial duty to

enforce a valid pretrial Rule 11 agreement. *Fortis Benefits*, 234 S.W.3d at 651.

We determine the scope of a Rule 11 agreement by examining the words used,

the surrounding circumstances from which the agreement arose, the state of and

allegations in the pleadings, and the attitude of the parties with respect to the issues.

*Lesikar v. EOG Res., Inc.*, 236 S.W.3d 457, 458–59 (Tex. App.—Amarillo 2007, no

pet.). We must examine the entire agreement to determine the parties' intent. *Sitaram

v. Aetna U.S. Healthcare of N. Tex., Inc.*, 152 S.W.3d 817, 824 (Tex. App.—

Texarkana 2004, no pet.).

We review the trial court's denial of a jury demand for an abuse of discretion.

*In re A.L.M.-F.*, 593 S.W.3d at 282; *Mercedes-Benz Credit Corp. v. Rhyne*, 925

S.W.2d 664, 666 (Tex. 1996). A trial court abuses its discretion when its decision is

arbitrary, unreasonable, and without reference to guiding principles. *In re A.L.M.-F.*, 593 S.W.3d at 282.

## C.    *Analysis*

Mindy argues on appeal that the agreed docket control order signed by both parties and the trial court on November 14, 2016, is not a qualifying Rule 11 agreement waiving her right to jury trial. Consequently, she argues that the trial court's finding in the divorce decree and its findings of fact and conclusions of law that she waived her jury right are erroneous and should be overturned. Mindy further argues that the trial court abused its discretion by denying her jury demand because it was timely under Rule 216 and because Allan did not attach evidence to his motion to strike Mindy's jury demand. Assuming *arguendo* that Mindy's jury demand was made at a reasonable time, we nevertheless affirm because she has not carried her appellate burden of demonstrating reversible error with respect to the divorce decree's waiver finding.

Mindy argues that the trial court abused its discretion by entering a final decree concluding that she had waived her right to a jury trial. Significantly, Mindy does not challenge Allan's assertion that an agreed docket control order setting the case for a bench trial exists. Rather, Mindy acknowledges that both parties' counsel submitted an agreed docket control order with a bench trial on November 14, 2016. Further, Mindy concedes that this agreement was reached "by the parties' counsel at

a hearing on one of the motions for continuance heard during this case." Nevertheless, Mindy makes three arguments for why the trial court's waiver finding was erroneous: (1) the agreed docket control order did not meet the criteria for an enforceable Rule 11 agreement; (2) an agreed docket control order does not evince a voluntary, knowing, and intelligent waiver of the right to a jury trial; and (3) the agreement is not enforceable because the lawyers agreed to a bench trial at a time before the dispute had become primarily focused on the custody of their children.

Mindy cannot demonstrate reversible error because the agreed docket control order that she references—and challenges as an invalid waiver of her right to a jury trial—is not in the appellate record.[1] It is well settled that "[t]he appellant bears the burden to bring forward on appeal a sufficient record to show the error committed by the trial court." *Huston v. United Parcel Serv., Inc.*, 434 S.W.3d 630, 636 (Tex.

---

[1] Allan has attached the agreed docket control order—along with three previous docket control orders—as an appendix to his brief. None of these docket control orders appear in the appellate record. "[D]ocuments attached to an appellate brief which are not part of the record may generally not be considered by the appellate court." *Robb v. Horizon Cmtys. Improvement Ass'n, Inc.*, 417 S.W.3d 585, 589 (Tex. App.—El Paso 2013, no pet.); *WorldPeace v. Comm'n for Lawyer Discipline*, 183 S.W.3d 451, 465 n.23 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ("[W]e cannot consider documents attached as appendices to briefs and must consider a case based solely upon the record filed."). The appellate record consists of the clerk's record and, if necessary to the appeal, the reporter's record. *See* TEX. R. APP. P. 34.1; *Robb*, 417 S.W.3d at 589. "The attachment of documents as exhibits or appendices to briefs is not formal inclusion in the record on appeal and, therefore, the documents cannot be considered." *Robb*, 417 S.W.3d at 589; *Jackson v. Citibank (S.D.), N.A.*, 345 S.W.3d 214, 214 (Tex. App.—Dallas 2011, no pet.) ("An appendix is not a substitute for a clerk's record nor are citations to the appendix a substitute for citations to the record.").

App.—Houston [1st Dist.] 2014, pet. denied) (citing *Nicholson v. Fifth Third Bank*, 226 S.W.3d 581, 583 (Tex. App.—Houston [1st Dist.] 2007, no pet.)); *Christiansen v. Prezelski*, 782 S.W.2d 842, 843 (Tex.1990) (per curiam). "The burden is on the appellant to see that a sufficient record is presented to show error requiring reversal." *Christiansen*, 782 S.W.2d at 843.

Addressing her arguments in turn, Mindy has not demonstrated that the agreed docket control order does not meet the criteria for an enforceable Rule 11 agreement. Rule 11 states that "[u]nless otherwise provided in these rules, no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record." TEX. R. CIV. P. 11; *see also Knapp Med. Ctr. v. De La Garza*, 238 S.W.3d 767, 768 (Tex. 2007) (per curiam); *Padilla v. LaFrance*, 907 S.W.2d 454, 459–60 (Tex. 1995).

Mindy does not explain exactly how the agreed docket control order fails to comply with Rule 11. Mindy does not dispute that the agreed order was written, signed, and part of the trial court's record. So long as the agreement met the Rule 11 criteria, the trial court had a ministerial obligation to enforce it. *See Fortis Benefits*, 234 S.W.3d at 651. Mindy cites no authority to support her argument that an agreed docket control order can never constitute a Rule 11 agreement waiving the right to a jury trial.

17

Next, Mindy argues that the trial court's waiver finding is an abuse of discretion because the agreed docket control order does not evince a "voluntary, knowing, and intelligent waiver by Mindy." She cites *Prudential* to support this argument.

*Prudential* addressed a jury waiver in a commercial contract. *See* 148 S.W.3d at 133. It did not involve a pretrial agreement between litigants. Regardless, the Texas Supreme Court has subsequently clarified that *Prudential* does not impose a "burden on the enforcing party to produce evidence that a [jury] waiver was executed knowingly and voluntarily." *In re Bank of Am., N.A.*, 278 S.W.3d 342, 344 (Tex. 2009) (orig. proceeding) (per curiam). Such a presumption is "contrary to the longstanding Texas contract principle that parties are free to enter into contracts without fear of retroactive nullification." *Id.* Instead, a "conspicuous provision is prima facie evidence of a knowing and voluntary waiver and shifts the burden to the opposing party to rebut it." *Id.* (quoting *In re Gen. Elec. Capital Corp.*, 203 S.W.3d 314, 316 (Tex. 2006) (orig. proceeding) (per curiam)). Because Mindy has not included the agreed docket control order in the record, we cannot find that the language of the order was not conspicuous.

Third, Mindy argues that the agreed docket control order was unenforceable because the lawyers agreed to a bench trial at a time before the dispute had become primarily focused on the custody of their children. According to Mindy, this

agreement was reached "before Allan filed his Second Amended Petition for Divorce, which substantially changed the issues involved by primarily focusing on custody of their children." However, the record reveals that Allan's First Amended Petition filed on April 11, 2016—like his Second Amended Petition filed on February 9, 2017—sought joint conservatorship of the children and to have Allan designated as the conservator who has the exclusive right to designate the primary residence of the children. Custody of the children was therefore a disputed issue in the case before the parties signed the agreed docket control order on November 14, 2016.

Finally, we note that Allan's failure to attach evidence to his motion to strike Mindy's jury demand does not compel a different result. This Court has held that a trial court abuses its discretion when it denies a jury demand as untimely under Rule 216 when the party seeking to avoid a jury trial supplies no evidence to support the denial. *See Sims v. Fitzpatrick*, 288 S.W.3d 93, 103–04 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (concluding that trial court abused its discretion in denying a timely filed jury demand when parties opposing demand pointed to no evidence that granting jury trial would have injured them, disrupted court's docket, or impeded ordinary handling of court's business); *In re Webb-Goetz*, No. 01-19-00139-CV, 2019 WL 3293697, at *3 (Tex. App.—Houston [1st Dist.] July 23, 2019, orig. proceeding) (same). Those opinions do not control here because Allan also asserted

that Mindy waived her jury trial right by agreement. The Texas Supreme Court has flatly rejected the notion that "Rule 216 prescribes the *only* way in which trial by jury can be waived." *Prudential*, 148 S.W.3d at 130. An agreement is an alternative basis for finding a jury waiver, so these decisions are inapposite.

Because the alleged Rule 11 agreement was an agreed order, Allan had no obligation to attach it to his motion. "It is well recognized that a trial court may take judicial notice of its own records in a cause involving the same subject matter between the same, or practically the same, parties." *Gardner v. Martin*, 345 S.W.2d 274, 276 (Tex. 1961). "[T]he trial court is presumed to judicially know what has previously taken place in the case tried before it, and the parties are not required to prove facts that a trial court judicially knows." *In re J.J.C.*, 302 S.W.3d 436, 446 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (internal quotations omitted); *Asplundh Tree Expert Co. v. Abshire*, 517 S.W.3d 320, 344 n.13 (Tex. App.—Austin 2017, no pet.) ("[A] trial court is presumed to have taken notice of its own records in a case because [a] trial judge judicially knows what has previously taken place in the case on trial.") (internal quotations omitted).

As Mindy acknowledges, in seeking to strike her jury demand, Allan argued that the agreed docket control order constituted an enforceable agreement to waive the parties' jury trial rights. At the May 18, 2017 bill of review hearing, Allan expressly requested that the trial court take judicial notice of the November 14th,

20

2016 agreed docket control order. The court did so, over Mindy's objection. Mindy has not alleged any error in that judicial notice.

We overrule Mindy's first issue.

**Denial of Motion for New Trial**

In her second issue, Mindy argues that the trial court abused its discretion by denying her motion for new trial because the trial court erroneously failed to (1) transcribe and include in the record interviews that it conducted in chambers with the children and (2) consider newly discovered evidence concerning the children's absences from school after Allan was named sole managing conservator.

*A.     Standard of Review*

We review a trial court's denial of a motion for new trial for an abuse of discretion. *Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 926 (Tex. 2009) (per curiam). A party seeking a new trial based on newly discovered evidence must demonstrate to the trial court that (1) the evidence has come to her knowledge since the trial; (2) the failure to discover the evidence sooner was not due to lack of diligence; (3) the evidence is not cumulative; and (4) the evidence is so material that it would probably produce a different result if a new trial were granted. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010); *Strong v. Strong*, 350 S.W.3d 759, 772 (Tex. App.—Dallas 2011, pet. denied) ("[A]dmissible evidence must be introduced at a hearing on the motion for new trial establishing such

essential facts as no prior knowledge on the part of the movant, the prior diligence exercised by the movant, and the nature of the newly discovered evidence.").

## B.   *Analysis*

### 1.   **Transcription of Interviews**

Family Code section 153.009 governs a trial court's ability to conduct an in-chambers interview of a child involved in a SAPCR. This section provides:

(a)   In a nonjury trial or at a hearing, on the application of a party, the amicus attorney, or the attorney ad litem for the child, the court shall interview in chambers a child 12 years of age or older and may interview in chambers a child under 12 years of age to determine the child's wishes as to conservatorship or as to the person who shall have the exclusive right to determine the child's primary residence. The court may also interview a child in chambers on the court's own motion for a purpose specified by this subsection.

(b)   In a nonjury trial or at a hearing, on the application of a party, the amicus attorney, or the attorney ad litem for the child or on the court's own motion, the court may interview the child in chambers to determine the child's wishes as to possession, access, or any other issue in the suit affecting the parent-child relationship.

(c)   Interviewing a child does not diminish the discretion of the court in determining the best interests of the child.

(d)   In a jury trial, the court may not interview the child in chambers regarding an issue on which a party is entitled to a jury verdict.

(e)   In any trial or hearing, the court may permit the attorney for a party, the amicus attorney, the guardian ad litem for the child, or the attorney ad litem for the child to be present at the interview.

(f)   On the motion of a party, the amicus attorney, or the attorney ad litem for the child, or on the court's own motion, the court shall cause a record of the interview to be made when the child is 12

22

years of age or older. A record of the interview shall be part of the record in the case.

TEX. FAM. CODE § 153.009. This statute is mandatory and requires the trial court to interview a child on the application of any party. *In re A.M.*, 604 S.W.3d 192, 199 (Tex. App.—Amarillo 2020, pet. denied); *In re McPeak*, 525 S.W.3d 310, 316 (Tex. App.—Houston [14th Dist.] 2017, orig. proceeding) (holding that trial court abused its discretion by denying mother's motion for court to confer in chambers with thirteen-year-old child). Section 153.009(f) "is quite specific in requiring a record of the interview to be kept on the motion of any party if the child is twelve years of age or older." *In re A.C.*, 387 S.W.3d 673, 676 (Tex. App.—Texarkana 2012, pet. denied).

Here, in September 2017, Mindy filed a motion for the trial court to confer with the parties' daughter, who was sixteen at the time.[2] Mindy stated that "[t]he issues of conservatorship and who shall have the exclusive right to determine the primary residence of the children in this case are contested." She requested that the trial court confer with her daughter in chambers, without the presence of counsel, "[f]or the purpose of determining the best interest of the children." Mindy also

---

[2]    In the motion to confer and in her brief on appeal, Mindy stated that her daughter was fourteen at the time. Mindy filed her motion in September 2017. Her daughter was born in August 2001 and was therefore sixteen years old at the time of the motion.

23

requested "that the Court cause a record of the interview with the child . . . be made and that the record of the interview be made a part of the record in this case."

The trial court conferred with both children—who were seventeen and fifteen at the time—after the close of trial in December 2018. It is unclear when the interviews with the children occurred, but the parties agree on appeal that the trial court did speak with the children.[3] It is undisputed that no record was made of these interviews. In its findings of fact and conclusions of law, the trial court found that Mindy "did not request the court reporter be present for interviews with the children at the time that the interviews commenced" and that Mindy "did not object to the lack of a reporter for the interviews with the children at the time of the commencement of the interviews."

On appeal, Mindy argues that the trial court incorrectly found that she did not request that the court reporter record the interviews with the children, pointing to the request that she filed in September 2017. She further argues that she could not have objected to the lack of a court reporter at the time of the interviews "because the interviews were not done in the presence of any of the parties or their counsel" and

---

[3]    After the close of trial, the trial court and counsel for the parties discussed when the children could be available to confer with the court. The trial court proposed meeting with the children a week after the end of trial, "in the afternoon because I don't want it to interfere with their schooling."

24

therefore she "was not in a position to see whether a court reporter was present as she requested."

In September 2017, Mindy filed a pretrial written motion requesting that the trial court confer with her daughter, who was over the age of twelve. This motion specifically requested that the court reporter record the interview and make the record "part of the record in this case." Under Family Code section 153.009(a) and (f), the trial court was required to interview the child in chambers "to determine the child's wishes as to conservatorship or as to the person who shall have the exclusive right to determine the child's primary residence," and the court was also required to "cause a record of the interview to be made," which "shall be part of the record in the case." TEX. FAM. CODE § 153.009(a), (f). The trial court interviewed both children after trial, but no record was made. We conclude that the failure to record the interviews was erroneous. *See id.*; *In re A.C.*, 387 S.W.3d at 677; *see also In re Lau*, 89 S.W.3d 757, 761 (Tex. App.—Houston [1st Dist.] 2002, orig. proceeding) (concluding that failure to make record of in-chambers interviews of sixteen- and seventeen-year-old children made record incomplete).

To the extent Allan argues that Mindy failed to preserve this contention for appellate review because, in September 2017, she requested that a court reporter record the trial court's interview with her daughter, but she did not object to the lack of a court reporter at the time the court finally interviewed both children after trial

25

in December 2018, we disagree. As the Texarkana Court of Appeals noted in *In re A.C.*, the failure of a court reporter to record an in-chambers interview between a trial court and a child is "demonstrably different from the failure of a court reporter to record proceedings in open court," which requires an objection by the complaining party to preserve the error for appellate review. *See* 387 S.W.3d at 677. The trial court may permit the attorney for a party or the amicus attorney to be present for the in-chambers interview, but it is not required to do so. *Id.*; TEX. FAM. CODE § 153.009(e). The Texarkana Court stated:

> There is no indication that the trial judge invited counsel for either litigant to observe the court's interview in chambers with the child, the record is silent as to whether the court reporter was physically present when the interview took place, and neither brief addresses this. It may be that [the father] assumed that a record of the interview was being made as it was taking place, raising the possibility that he would have had no opportunity to call it to the attention of the trial court until a post-interview discovery of the failure to make a record.

*In re A.C.*, 387 S.W.3d at 677. Because the Texarkana Court could not determine whether the father had been "afforded a genuine opportunity to object to the failure to make a record of the interview," the court assumed "that the failure to make a record of the interview was error and there was no opportunity provided [to the father] to complain of this omission before the interview took place." *Id.*

Similarly, here, the record is silent concerning the circumstances under which the trial court interviewed the children in chambers, including whether the parties or their counsel were aware of the presence—or lack thereof—of a court reporter

26

during the interviews. As in *In re A.C.*, it is possible that Mindy assumed the court reporter was making a record of the interviews—as she had requested in her pretrial motion—but did not learn of the failure to record the interviews until later and therefore had no opportunity to call the problem to the trial court's attention before the interviews occurred. *See id.* Under these circumstances, we conclude that Mindy preserved this complaint for appellate review.

Ultimately, however, we conclude that the trial court's error in failing to ensure that the interviews were recorded by the court reporter was harmless. Interviewing a child is designed to aid the court in making conservatorship and possession determinations, but it "does not diminish the discretion of the court in determining the best interests of the child." TEX. FAM. CODE § 153.009(c); *In re A.C.*, 387 S.W.3d at 677 (noting that "the information obtained by the trial court in such an interview is strictly supplemental to the evidence taken in court, the purpose of the interview being to aid the court in making its determination"); *In re K.R.P.*, 80 S.W.3d 669, 677 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) ("Although such interview statements may be informative to a trial court in making its custody decision, they in no way diminish the discretion of the trial court."). As noted in *In re A.C.*, the Family Code does not contain any requirements that the child in an in-chambers interview be sworn or that the Rules of Evidence should apply during the interview. *See* 387 S.W.3d at 677.

"Presumably, information gleaned in such an interview can be placed in the storehouse of other information the trial court can use in exercising its discretion in matters of this type pertaining to children." *Id.*; *see Syed v. Masihuddin*, 521 S.W.3d 840, 847 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("In determining the issues of conservatorship and possession of a child, the trial court is given wide latitude in determining the best interest of the child and will be reversed only for an abuse of discretion."). The trial court has broad discretion in making conservatorship and possession determinations, and the court "may choose to either take into account the information learned at such an interview [under section 153.009] or ignore it in its entirety." *In re A.C.*, 387 S.W.3d at 678. It is therefore "difficult to imagine that a failure to cause the interview to be recorded would cause a different outcome or result." *See id.*; TEX. R. APP. P. 44.1(a) (providing that judgment may not be reversed on appeal unless error complained of probably caused rendition of improper judgment or probably prevented appellant from properly presenting case to court of appeals).

We conclude that although the trial court erred by failing to ensure that its interviews with the children were recorded by the court reporter and made a part of the record of the case, this error was harmless and did not cause a different outcome or result. *See In re A.C.*, 387 S.W.3d at 678.

## 2. Newly Discovered Evidence

Mindy further argues that the trial court erred by denying her motion for new trial based on newly discovered evidence. Mindy argues that she presented her declaration, her testimony, and school records reflecting that during the semester after trial concluded, when the children were living with Allan, they both had a significant number of unexcused absences and tardiness from their classes. Mindy argues that this evidence "is extreme with respect to the welfare of the children" and demonstrates "a steep decline in [the children's academic] performance."

At the motion for new trial hearing, the trial court admitted school records for both children demonstrating their unexcused absences and tardiness during the 2018–2019 academic year, the spring semester of which occurred after the trial had ended and the children were living with Allan. The trial court also admitted a summary of the absences and tardiness that Mindy prepared based on the school records. In this document, Mindy represented that their daughter had been tardy sixteen times and had missed twelve total school days since the date the trial ended, and their son had been tardy thirteen times and had missed eight total school days. At the hearing, Mindy acknowledged that their daughter graduated from high school, even though, at the time of trial, there was a serious question whether she would be able to graduate. She also acknowledged that their son had passed to the next grade and would be starting his junior year of high school in the fall.

Throughout the trial, the trial court heard extensive evidence concerning the children's academic performance, including their propensity to miss classes while living both with Mindy and with Allan. The trial court also heard evidence at trial that, during the fall semester of 2018, after the children had been placed in Allan's custody pursuant to temporary orders, their grades had somewhat improved. Mindy's new evidence reflected that, although the children continued missing classes while living with Allan, both children ultimately passed their grade levels, and their daughter graduated high school. We conclude that this evidence is not "so material it would probably produce a different result if a new trial were granted." *See Waffle House*, 313 S.W.3d at 813. We hold that the trial court did not abuse its discretion in denying Mindy's motion for new trial. *See id.* ("Denial of a motion for new trial is reviewed for abuse of discretion."); *Dolgencorp of Tex.*, 288 S.W.3d at 926.

We overrule Mindy's second issue.

## Child Support Award

In her third issue, Mindy argues that the trial court erred in calculating her monthly child support payments because the court impermissibly looked beyond Mindy's net resources and considered the assets of her parents.

## A.   *Standard of Review and Governing Law*

A trial court has discretion to set child support within the parameters provided by the Texas Family Code, and we will not disturb a court's child support order on appeal unless the complaining party can show a clear abuse of discretion. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011) (quoting *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)); *Trumbull v. Trumbull*, 397 S.W.3d 317, 319 (Tex. App.—Houston [14th Dist.] 2013, no pet.). The trial court abuses its discretion if its decision is arbitrary, unreasonable, or without reference to any guiding rules or principles. *Trumbull*, 397 S.W.3d at 319 (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)). The trial court also abuses its discretion if it fails to analyze or apply the law correctly. *Iliff*, 339 S.W.3d at 78.

Under this standard, legal and factual sufficiency of the evidence are not independent grounds of error but are instead relevant factors in assessing whether the trial court abused its discretion. *Trumbull*, 397 S.W.3d at 319. We review the evidence in the light most favorable to, and indulge every legal presumption in favor of, the trial court's ruling. *In re K.M.B.*, 606 S.W.3d 889, 894 (Tex. App.—Dallas 2020, no pet.); *Villalpando v. Villalpando*, 480 S.W.3d 801, 811 (Tex. App.—Houston [14th Dist.] 2015, no pet.). The trial court does not abuse its discretion when some evidence of a substantive and probative character supports its decision.

*Trumbull*, 397 S.W.3d at 319–20; *Marquez v. Moncada*, 388 S.W.3d 736, 739 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

In determining child support liability, the trial court must calculate the obligor's net resources. TEX. FAM. CODE § 154.062(a); *In re K.M.B.*, 606 S.W.3d at 894 ("The starting point for assessing child support liability under the Texas Family Code is to calculate the child support obligor's monthly 'net resources' and apply statutory guidelines to that amount."). The statutory child support guidelines presumptively set the amount of support for two children at 25 percent of the obligor's monthly net resources up to $8,550.[4] *See* Act of May 22, 2007, 80th Leg., R.S., ch. 620, § 2, 2007 Tex. Gen. Laws 1188, 1189 (amended 2021) (current version at TEX. FAM. CODE § 154.125(a), (a-1), (b)); TEX. FAM. CODE § 154.126(a) ("If the obligor's net resources exceed the amount provided by Section 154.125(a), the court shall presumptively apply the percentage guidelines to the portion of the obligor's

---

[4]   The Texas Legislature amended Family Code section 154.125(a) in the 2021 legislative session. The version of this statute in effect at the time the trial court imposed the support obligation at issue provided, "The guidelines for the support of a child in this section are specifically designed to apply to situations in which the obligor's monthly net resources are not greater than $7,500 or the adjusted amount determined under Subsection (a-1), whichever is greater." Act of May 22, 2007, 80th Leg., R.S., ch. 620, § 2, 2007 Tex. Gen. Laws 1188, 1189 (amended 2021) (current version at TEX. FAM. CODE § 154.125(a)). Subsection 154.125(a-1) requires the Title IV-D agency, the Texas Office of the Attorney General, to adjust the amount provided for in subsection (a) "every six years as necessary to reflect inflation." TEX. FAM. CODE § 154.125(a-1). Effective September 1, 2013, the Texas Attorney General raised the amount from $7,500 to $8,550. *See* 39 Tex. Reg. 4647, 4647 (2013) (Off. of the Att'y Gen.).

net resources that does not exceed that amount."). The presumptive amount of support for one child is 20 percent of the obligor's monthly net resources. TEX. FAM. CODE § 154.125(b); *see also id.* § 154.127(a) ("A child support order for more than one child shall provide that, on the termination of support for a child, the level of support for the remaining child or children is in accordance with the child support guidelines.").

Family Code section 154.062(b) provides that "resources" include:

(1)  100 percent of all wage and salary income and other compensation for personal services (including commissions, overtime pay, tips, and bonuses);

(2)  interest, dividends, and royalty income;

(3)  self-employment income;

(4)  net rental income . . . ; and

(5)  all other income actually being received, including severance pay, retirement benefits, pensions, trust income, annuities, capital gains, social security benefits other than supplemental security income, United States Department of Veterans Affairs disability benefits . . . , unemployment benefits, disability and workers' compensation benefits, interest income from notes regardless of the source, gifts and prizes, spousal maintenance, and alimony.

*Id.* § 154.062(b); *In re K.M.B.*, 606 S.W.3d at 894 ("Section 154.062 of the family code provides an all-inclusive definition of 'net resources' and then specifies certain sums which are not considered 'resources' as well as certain sums the court must deduct from its calculation of net resources."); *In re A.M.P.*, 368 S.W.3d 842, 849

(Tex. App.—Houston [14th Dist.] 2012, no pet.) ("Under the plain meaning of section 154.062, gifts are included in the calculation of net resources."). Section 154.062(c) specifically excludes from the definition of "resources": return of principal or capital; accounts receivable; benefits paid in accordance with federal public assistance programs; and payments for foster care of a child. TEX. FAM. CODE § 154.062(c); *see also id.* § 154.062(d) (requiring deduction of certain items from "resources," including social security taxes, federal income tax, and expenses for court-ordered health and dental insurance for obligor's child).

"The language of section 154.062(b)(5) indicates the legislature intended that 'all receipts of money that are not specifically excluded by the statute (section 154.062(c)), whether nonrecurring or periodic, whether derived from the obligor's capital or labor or from that of others, must be included in the definition of resources.'" *In re K.M.B.*, 606 S.W.3d at 895 (quoting *In re P.C.S.*, 320 S.W.3d 525, 537 (Tex. App.—Dallas 2010, pet. denied)). As the Dallas Court of Appeals has stated, "The wording of section 154.062(b) is broad and nonrestrictive to encompass any compensation, regardless of what it is called, and nothing in the section indicates the list of resources is exclusive." *Id.* at 897. The obligor has a duty to pay child support and that duty "is not limited to an obligor's ability to pay from earnings but also includes the obligor's ability to pay from any and all available sources." *Id.*

### B. Analysis

In the final divorce decree, the trial court ordered Mindy to pay child support to Allan in the amount of $1,576.86 per month until their daughter reaches the age of eighteen or graduates from high school; thereafter, the decree ordered Mindy to pay $1,261.49 in child support per month until their son reaches the age of eighteen or graduates from high school. In its findings of fact and conclusions of law, the trial court made several findings relevant to Mindy's finances, including:

- Mindy regularly received gifts from her parents in excess of $100,000.00 each year for many years.

- Mindy expects to continue receiving such gifts from her parents for the years that child support will be due and payable.

- Mindy has stated that she has the ability to live anywhere in the world when she inherits her trust fund.

- Mindy received a large inheritance from a deceased aunt in 2017.

- Mindy refused to produce financial records from trusts in which she was a beneficiary despite court orders to do so.

- Mindy refused to reveal the amount of money that she inherited during the litigation in her testimony.

- Mindy inherited several hundred thousand dollars during the litigation.

- Mindy stands to inherit from additional family trusts in the future.

- Mindy has admitted that her monthly expenses exceed $11,000.00 per month.

- For the years 2015–2017, Mindy made written demands averaging over $125,000.00 per year for reimbursement of funds that she said that she spent from her net resources on the children's needs.

35

- Mindy's Financial Information Statement shows that she spends $3,255.00 per month in children's expenses alone.

- The money spent by Mindy for the years 2015 to 2017 shows that she has net resources in excess of $135,000.00 per year for each of those years.

- Mindy has net resources averaging over $11,250.00 per month.

- Mindy will likely continue to have resources in excess of $135,000.00 per year for the years that child support will be payable for their son, who will be a junior in high school.

- There is no expectation of a reduction in net resources for Mindy before the youngest child reaches 18 years of age.

- Mindy's net resources for child support calculation should include unemployment benefits, disability income, gifts, trust income, interest, and dividends pursuant to Section 154.062 of the Family Code.

At trial, Mindy testified that she is disabled, she is not employed, and she does not have an income. She received long-term disability benefits beginning in October 2015, but those payments, which totaled $3,900 per month, stopped in March 2018. At the time of trial, she received $1,900 per month from the Social Security Administration. Mindy argues that this is the amount that the trial court should have considered when calculating her net resources and determining her child support obligations.

Allan, Mindy, and Bonnie Manley, Mindy's mother, all testified that Mindy's parents had a history of helping the couple financially during their marriage, including sharing bank accounts and credit cards, paying bills, and paying expenses for the children. This behavior continued through the pendency of the underlying

proceedings. Allan testified that Mindy's parents "constantly" transferred large sums of money into bank accounts in his and Mindy's name. Allan was unable to determine what money was Mindy's and what money belonged to her parents,[5] but he estimated that her parents gave her around $100,000 per year. Mindy testified, "[M]y mom controls the checkbook and pays the bills out of it. And she uses when she can. When I run out, I guess she uses her own." Mindy testified that she "honestly [does not] have any idea" how much her parents give her on a monthly basis and that, since her long-term disability payments ended, her mother has "paid for a hundred percent of [her] bills," but she does not "have any idea what that adds up to."

During the pendency of the divorce proceedings, from 2015 through 2018, Mindy spent well over $100,000 each year on expenses for the children, including extracurricular activities, international vacations, and a vehicle for their daughter. Each month, Mindy made mortgage payments on a house in Friendswood, lease payments on an apartment in Dallas, and for one year during the pendency of the divorce, she rented a house in The Woodlands and paid over $3,000 per month in rent. Mindy agreed that any money she received from her mother for the children's benefit and for her own expenses should be considered a gift. Manley did not know

---

[5]   Mindy testified that her mother would sometimes give her "credit cards to use and then she pays those bills" and sometimes her mother would put money in a joint account to cover expenses, but her mother would not give her cash.

how much she and her husband had paid Mindy throughout her marriage and the divorce proceedings, but she agreed that she was not asking to be paid back. She also testified that she would continue to take care of her grandchildren financially.

The trial court also had evidence before it that Mindy was a beneficiary of at least two trusts. One trust, called the Cassidy Trust, was created by Mindy's great aunt, who died in May 2017. The total value of the trust—as well as the value of the distribution to which Mindy was entitled upon her great aunt's death—was unclear because Mindy had never provided complete records concerning this trust. But based on statements Mindy had made in the past, Allan estimated that the value of that trust was at least $2 million. Mindy testified that she had not received any money after her great aunt's death, stating, "My mother handles all that." She testified that she was not sure of the value of the trust. When asked if the money from this trust was being used to fund her lifestyle and her children's lifestyles, Mindy responded, "I don't know. I don't ask her," referring to her mother. She testified, "I don't have anything to do with the finances." Mindy also testified that she was an authorized user on two of her great aunt's credit cards, that she continued to use those credit cards, and that her mother pays the bill for those cards.

Manley testified that the Cassidy Trust named several beneficiaries in addition to her and Mindy. Manley had distributed the shares to the other beneficiaries within six to nine months after her aunt's death, but she had not made the distribution to

Mindy. Manley testified that she did not distribute Mindy's share to her "[b]ecause [Mindy] doesn't spend money well, and [Manley] would rather distribute and use that money to pay necessary bills." Manley could not recall how much each beneficiary's share was,[6] but she stated that she had already spent Mindy's share. Manley did not know the total value of this trust, but she disagreed that it was worth millions of dollars.

Mindy was also the beneficiary of the Manley Family Trust, a revocable trust administered by her parents. Mindy testified that she did not have a right to withdraw money from that trust, but instead any distributions from the trust are discretionary with the trustee. Manley agreed that she had discretion in determining whether to make a distribution from the trust assets to Mindy and that she would not do so while Mindy was going through the divorce.

On appeal, Mindy argues that the trial court impermissibly considered the assets of her parents when determining that she had net resources in excess of $8,550 per month. She argues that she has no control over her parents' assets and no ability to give herself distributions from their assets, and therefore the trial court should not have considered the "periodic, discretionary, and charitable gifts to Mindy and her children" as part of her net resources.

---

[6] At one point, Manley stated that each distribution "was like 150,000 perhaps per person," but she then immediately stated, "But I'm not sure."

We disagree that, in calculating Mindy's net resources, the trial court was not allowed to consider the evidence that Mindy's parents had, for years, including during the pendency of the divorce proceedings, paid substantial amounts of Mindy's and the children's expenses. Family Code section 154.062(b)(5) specifically provides that a party's resources include "all other income actually being received," including "gifts." TEX. FAM. CODE § 154.062(b)(5); *In re K.M.B.*, 606 S.W.3d at 895 ("The language of section 154.062(b)(5) indicates the legislature intended that 'all receipts of money that are not specifically excluded by the statute (section 154.062(c)), whether nonrecurring or periodic, whether derived from the obligor's capital or labor or from that of others, must be included in the definition of resources.'"); *In re P.C.S.*, 320 S.W.3d at 537. Both Mindy and Manley characterized the amounts that Manley paid on Mindy's and the children's behalf as gifts, and Manley testified that she spent the money with no expectation of being repaid. The trial court had evidence before it that, despite receiving limited amounts from the Social Security Administration in disability benefits during the pendency of the divorce, Mindy spent in excess of $100,000 each year the divorce was pending. Mindy testified that Manley was ultimately responsible for paying all her bills, and Mindy, Manley, and Allan all agreed that Manley and her husband spent large amounts of money on Mindy's and the children's behalf.

We conclude that, in calculating Mindy's net resources, the trial court appropriately considered the evidence that, over the course of the parties' marriage and the divorce proceedings, Mindy's parents essentially gave her hundreds of thousands of dollars to be used to pay her bills and for the children's expenses. Sufficient evidence supports the trial court's findings that Mindy had net resources in excess of $8,550 per month, the maximum amount of monthly net resources used under the child support guidelines to calculate child support payments. *See* TEX. FAM. CODE § 154.125–.126; *Marquez*, 388 S.W.3d at 739 (stating that trial court does not abuse its discretion in setting child support amount if some evidence of substantive and probative character supports decision). We hold that the trial court did not abuse its discretion in setting Mindy's child support amount at $1,576.86 while both of her children were under eighteen and at $1,261.49 while her younger child was under eighteen.[7]

We overrule Mindy's third issue.

### Attorney's Fees Award

Finally, in her fourth issue, Mindy argues that the trial court erred by ordering her to pay a total of $172,882 in attorney's fees—representing 80 percent of Allan's

---

[7] We note, as Allan points out, that 25% of $8,550 (the amount of child support the guidelines in the Family Code sets as appropriate for two children) is $2,137.50 and 20% of $8,550 (the amount for one child) is $1,710. The trial court, therefore, did not award the maximum amount of child support permissible under the child support guidelines.

trial-level attorney's fees, $20,000 in appellate fees, and $34,600 in amicus attorney's fees—because the size of the parties' community estate does not support this award.

## A.     Trial-Level Attorney's Fees and Amicus Fees

In a divorce proceeding, the trial court may award reasonable attorney's fees and expenses. TEX. FAM. CODE § 6.708(c); *Fuentes v. Zaragoza*, 555 S.W.3d 141, 172 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *see also* TEX. FAM. CODE § 106.002(a) (providing that in SAPCR, trial court "may render judgment for reasonable attorney's fees and expenses"); *Id.* § 107.023(a)–(b) (providing that attorney appointed as amicus attorney in SAPCR is entitled to reasonable fees and expenses). The trial court has broad discretion in deciding whether to award reasonable attorney's fees in a divorce action. *Seitz v. Seitz*, 608 S.W.3d 272, 279 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

The reasonableness of the fees is a fact question and must be supported by the evidence. *Fuentes*, 555 S.W.3d at 172; *Russell v. Russell*, 478 S.W.3d 36, 48 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("The reasonableness of attorney's fees is ordinarily left to the factfinder, and a reviewing court may not substitute its judgment for the fact finder's."). "To support an award of attorney's fees, evidence should be presented on the 'hours spent on the case, the nature of preparation, complexity of the case, experience of the attorney, and the prevailing hourly rates'

42

in the community." *Fuentes*, 555 S.W.3d at 172 (quoting *Hardin v. Hardin*, 161 S.W.3d 14, 24 (Tex. App.—Houston [14th Dist.] 2004, no pet.)).

Mindy argues that the value of the community estate as proved at trial does not support the attorney's fees award against her, citing a Fourteenth Court of Appeals case for the proposition that if there is not a sufficient community estate, there is no basis for awarding attorney's fees. *See Chiles v. Chiles*, 779 S.W.2d 127, 129 (Tex. App.—Houston [14th Dist.] 1989, writ denied), *disapproved of on other grounds by Twyman v. Twyman*, 855 S.W.2d 619 (Tex. 1993); *see also Capellen v. Capellen*, 888 S.W.2d 539, 544 (Tex. App.—El Paso 1994, writ denied) (stating that award of attorney's fees is factor to be considered by trial court in making equitable division of community estate). In *Chiles*, the Fourteenth Court noted that a trial court does not have the inherent authority to award attorney's fees in a divorce action and no statute permitted the award of attorney's fees in a divorce, but the court could award either spouse their attorney's fees as part of the court's power to make a just and right division of the marital estate. 779 S.W.2d at 129. The court stated, "Other than the court's equitable power to divide the community property, we can find no other authority for a trial court to award attorney's fees to one party in a divorce action." *Id.* Because, in *Chiles*, the parties had executed a premarital agreement providing that the parties would not have a community estate, and therefore no marital estate existed for the trial court to divide, the Fourteenth Court concluded

43

that the trial court's award of the wife's attorney's fees was erroneous. *Id.* at 128, 129.

*Chiles* was decided in 1989. In 2013, the Texas Legislature amended Family Code section 6.708 to expressly provide that, in a suit for dissolution of a marriage, "the court may award reasonable attorney's fees and expenses." *See* TEX. FAM. CODE § 6.708(c). Section 6.708(c) contains no requirement that, in setting the amount of an attorney's fees award in a divorce proceeding, the trial court must take into account the value of the community estate and may not award attorney's fees in an amount that exceeds the value of the community estate. Instead, the only qualifier on the award contained in the statutory language is that the attorney's fees awarded must be "reasonable." *Id.* The trial court has "broad discretion in deciding whether to award reasonable attorney's fees" in a divorce. *Seitz*, 608 S.W.3d at 279.

Here, Allan's counsel, Greg Hughes, testified that Allan had incurred a total of $157,709.87 in attorney's fees through trial. He testified that the amount was so high in part because the case had been pending for approximately three years, there had been numerous hearings before the trial court prior to the trial itself, Mindy had filed a mandamus action with this Court during the pendency of the case, and the case had involved several novel issues. The trial court admitted, over Mindy's objection, approximately 50 pages of billing records that reflected the actions performed, the number of hours spent on the particular matter, and the hourly rate.

44

The trial court also admitted billing records from the amicus attorney reflecting that she had received $34,462 in payments throughout the pendency of the proceedings and that $34,600 remained outstanding.

Mindy objected to Hughes's invoice on the basis that Hughes had not provided the invoices to her counsel until trial and, thus, allowing this exhibit would essentially condone trial by ambush. She also argued that, at prior hearings, the trial court had ordered her to pay certain amounts of Allan's attorney's fees, but the invoices did not take these prior orders into account and therefore awarding those fees constituted a double recovery. Hughes responded that he had provided interim fee statements during the pendency of the case and Mindy's counsel was aware of his hourly rate. Hughes also acknowledged that the trial court had ordered Mindy to pay some interim fees, but she had not paid those fees. He stated, "And I would certainly expect a credit against what is owed if and when she does actually make any of those payments."

In the divorce decree, the trial court found that Allan had incurred $157,709.87 in reasonable attorney's fees, expenses, and costs. The court ordered Mindy to pay $118,282.40 in Allan's attorney's fees and $34,600 in amicus attorney's fees.

We conclude that the trial court acted within its discretion when it assessed Allan's attorney's fees and the amicus attorney's fees against Mindy. *See* TEX. FAM.

45

CODE §§ 6.708(c), 107.023(a)–(b); *Seitz*, 608 S.W.3d at 279. Furthermore, the trial court had before it billing records to support the attorneys' testimony concerning their fees. We therefore hold that the trial court's attorney's fees award was supported by sufficient evidence. *See Seitz*, 608 S.W.3d at 279; *Fuentes*, 555 S.W.3d at 172.

**B.      *Appellate Attorney's Fees***

Mindy also argues that the trial court erred by awarding Allan $20,000 in appellate attorney's fees that were not properly conditioned on Allan prevailing on appeal. The divorce decree stated:

> ***Attorney's Fees on Appeal***
>
> **IT IS FURTHER ORDERED AND DECREED** that Allan Ray Comstock is awarded a judgment of twenty thousand dollars ($20,000.00) against Mindy Lee Comstock for attorney's fees on appeal for the benefit of Allan Ray Comstock's attorney, Greg A. Hughes. The judgment shall bear interest at 5 percent per year compounded annually from the date the award is made final by the appropriate appellate court's judgment, for which let execution issue. Greg A. Hughes may enforce this judgment for fees, expenses, and costs in Greg A. Hughes's own name by any means available for the enforcement of a judgment for debt.
>
> **IT IS FURTHER ORDERED AND DECREED** that the judgment of attorney's fees on appeal rendered against Mindy Lee Comstock is conditioned on Mindy Lee Comstock's pursuit of an ultimately unsuccessful appeal.
>
> **IT IS ORDERED AND DECREED** that Mindy Lee Comstock shall be entitled to a remittitur of the twenty thousand dollars ($20,000.00) if an appeal is not filed with the Court of Appeals.

46

A trial court may not penalize a party for taking a successful appeal. *Keith v. Keith*, 221 S.W.3d 156, 171 (Tex. App.—Houston [1st Dist.] 2006, no pet.). To that end, the trial court must condition an award of appellate attorney's fees upon the appellant's unsuccessful appeal. *Id.* The divorce decree here specifically provides that the judgment of appellate attorney's fees against Mindy "is conditioned on [Mindy's] pursuit of an ultimately unsuccessful appeal." We conclude that the trial court properly conditioned the award of appellate attorney's fees upon Mindy's unsuccessful appeal.

We overrule Mindy's fourth issue.

## Conclusion

We affirm the judgment of the trial court.

April L. Farris
Justice

Panel consists of Chief Justice Radack and Justices Goodman and Farris.

Justice Goodman, dissenting.